No. 37,273

THE STATE OF KANSAS, *Appellee*, v. HOBART WINCHESTER, *Appellant*.

(203 P. 2d 229)

Opinion filed March 5, 1949.

*Jay W. Scovel,* of Independence, argued the cause and was on the brief for the appellant.

*Roy Kirby,* county attorney, argued the cause, and *Edward F. Arn,* attorney general, and *John F. O'Brien,* of Independence, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRICE, J.: The appellant was convicted of burglary in the first degree and larceny. His motion for a new trial was overruled and he was sentenced to confinement in the state penitentiary for the remainder of his natural life under the provisions of the habitual criminal act. On appeal one of his specifications of error is that the court erred in overruling his motion for a new trial—the grounds of the latter being:

1. The court admitted illegal testimony.
2. The court misdirected the jury in material matters of law.
3. The verdict is contrary to law.
4. The verdict is contrary to the evidence.
5. Erroneous rulings of the court.

Another specification of error is that the court erred in sentencing appellant under the habitual criminal act.

The facts brought out at the trial may be summarized briefly as follows:

The testimony of the state disclosed that about 2:30 or 3:00

o'clock in the morning of October 17, 1946, the Dillon home in Independence, Kan., was burglarized and that there was taken by the burglar a fountain pen, two sugar stamps, some chewing gum, a five-dollar bill, six one-dollar bills, and about a dollar in change, together with a small penknife. These items were contained in Mrs. Dillon's purse. That the burglar used a small flashlight with a red bulb; that Mrs. Dillon and her son were awakened by him but that it was dark and neither one of them saw the face of the intruder; that the police were called and after a search two of the officers went to the Missouri Pacific station just as a train bound for Coffeyville was arriving and the appellant was entering the station and attempting to buy a ticket; that he was searched and had on his person two sugar stamps, some one-dollar bills and change, a package of gum and two knives, one of the latter being identified by Mrs. Dillon as belonging to her. Appellant was taken to the police station and a later search in the washroom of the Missouri Pacific station produced the fountain pen lost by Mrs. Dillon and a small flashlight with a red bulb. None of the Dillons was able to identify the appellant but Mrs. Dillon and her son stated the burglar was either colored or a white man with a southern accent.

The evidence of the appellant, a Negro, disclosed that he lived at Arkansas City, Kan.; that he had been working for the Kansas State Highway Department; that the job on which he was working was about to end and that he had been told the Missouri Pacific at Coffeyville might need some men for an extra gang; that he determined to go to Coffeyville to find out about a job; that his wife gave him the sugar stamps to obtain for her some sugar before he left but he neglected to do so; that he came into Independence on the Santa Fe about 7:30, p. m., stayed at the Santa Fe station until about 3:00, a. m. and then went to the Missouri Pacific station to catch the train to Coffeyville; that he arrived at the station about the time the train pulled in and while attempting to buy a ticket was picked up by the officers; that the money in his possession when picked up was his; that the knife belonged to his wife and that he usually carried chewing gum; that he did not have any flashlight such as was found in the washroom and had no knowledge of the fountain pen; and that he had never been to or burglarized the Dillon home or any other home in Independence, Kan.

This trial, had on February 9, 1948, was the second trial of the case, the first one having resulted in a hung jury.

In his brief and argument to this court counsel for appellant frankly concedes that there is probably sufficient evidence to sustain the verdict of the jury if it were not for the number of errors and prejudicial acts committed in the trial of the case and concludes by saying that in the event it should be determined the verdict of the jury was properly arrived at and should be upheld, it is not believed that the extreme sentence of life imprisonment under the habitual criminal act should be sustained due to the fact that the previous convictions were not shown by competent evidence as required by the statute (G. S. 1947 Supp. 21-107a).

One of the principal alleged trial errors came about as follows: The state, in its case in chief, over the objection of the defendant, was permitted to introduce in evidence a question-and-answer statement taken down by the stenographer of the then county attorney when the latter was questioning the defendant shortly after his apprehension. A Mr. Troutman, chief of police of Independence, was also present at the questioning and this statement contained the following:

"Mr. Troutman: This is the record from Arkansas City Police Department I just read him there. That's all they have. They don't know how many more he's got.

"Mr. Grant [County Attorney]: You're guilty of burglary, fellow, in Kansas. A. I don't know.

"Q. Well, you're going to be tried for it. A. I am not guilty of it. When they found that pen and flashlight a sergeant was with me.

"Mr. Troutman: Sure, these two policemen when they drove up and you saw that police car and you ran to the men's toilet and you opened the door and threw them in there. A. I couldn't do that because I walked into the station, a little fellow was right in the doorway with me just as I walked up to buy the ticket. That is as far as I got in the station, and when they found that pen and flashlight in the toilet me and the sergeant was standing in the depot waiting room, and this large officer came out with that there and asked me, 'Boy, did you ever see these before?' and I said, 'No, sir, I never have seen these before.

"Mr. Grant: Where did you go to the penitentiary from, in Oklahoma? A. I went from Holdenville and Okmulgee.

"Q. Which one first: A. Okmulgee.

"Q. You went from Okmulgee first, then you went from Holdenville the second time. Well, we will just charge him with—that is enough dope on him. Your wife's name is Mabel. Where does she live? A. Arkansas City.

"Q. I know, but what address? A. 318 North D Street.

"Q. Is that where you and she live? A. Yes.

"Mr. Troutman: She's suing him for divorce now. Then you don't live there now? A. Yes.

"Q. Still live there? A. Yes.

"Mr. Grant: What time did this happen?

"Mr. Troutman: 7:45 this morning.

"Mr. Grant: And the family was home in bed?

"Mr. Troutman: Yes.

"Mr. Grant: And somebody came in as I understand and aroused them or something?

"Mr. Troutman: This boy woke up when they put this flashlight in his face.

"Mr. Grant: They were in the room where the boy was and put this flashlight in his face, and that is the one where this party was?

"Mr. Troutman: That's right. He was in Mr. and Mrs. Dillon's room too because he got her pocketbook and his billfold.

"Mr. Grant: Which one spoke to the intruder, the boy? A. I don't know which one.

"Mr. Grant: Somebody said, who are you?

"Mr. Troutman: That was the boy who said who are you, and he said, Old Joe.

"Q. How old is the boy? A. He's going to high school and plays on the football team, about 15 or 16.

"Q. How did he get in? A. Just opened the door and went in—the doors wasn't locked."

It is obvious that the "boy" referred to is the son of the complaining witness.

It is not clear as to just why the state offered or the court admitted in evidence before the jury the foregoing colloquy largely between the chief of police and the county attorney! Certainly this so-called "statement" is not in the nature of a "confession" by the defendant of the offense for which he was being investigated, and nowhere in the record is it shown that that portion relating to prior offenses by the defendant was offered for the purpose of showing his alleged tendencies to commit the crime in question, even assuming that under the state of the testimony such evidence was admissible! The state argues that the admission of this statement in evidence was not error for the reason that since the defendant was present the conversation between the chief of police and the county attorney was not hearsay—that the defendant had the opportunity to deny the conversation was had—and since he has not done so, he is not in a position to complain.

We cannot agree with this contention and hold that the admission of such evidence was clearly erroneous and highly prejudicial to the rights of the defendant. If the state desired to use the testimony of the chief of police, he should have been called as a witness.

Furthermore, evidence of other offenses by the defendant in the state's case in chief may only be offered under certain circumstances and when surrounded by certain legal safeguards—not here present and which need not here be discussed.

Another alleged trial error occurred during the cross-examination of the defendant. He was being questioned as to his presence in Independence, where he had come from and where he was going. He had testified that he was going from Arkansas City to Coffeyville; that he had come from Arkansas City to Independence on the Santa Fe and intended to take the Missouri Pacific on to Coffeyville. (We are told that the Santa Fe train from Arkansas City to Independence was locally known and referred to as the "Doodle Bug.")

At this point the court took over the cross-examination of the defendant and the following appears:

"Q. You started from Arkansas City to Coffeyville? A. Yes, sir.

"Q. You came here on 'The Doodlebug'? A. Yes, sir.

"Q. Why didn't you stay on 'The Doodlebug' and go to Coffeyville? A. I didn't know I could make that kind of connection.

"Q. Did you ask the conductor on 'The Doodlebug'? A. No, sir.

"Q. Did you ask the agent who sold you the ticket? A. No, sir.

"Q. If you could stay on 'The Doodlebug' and go to Coffeyville? A. No, sir.

"Q. You know that it did, don't you? A. I suppose it did.

"Q. You stayed here five or six hours later to go to Coffeyville, A. Yes, sir.

"Mr. Scovel: It may be that this argument of the Court is correct, I am objecting to it.

"Q. Sure, you can object to that; I am trying to point out what the facts are. You know it to be a fact that the train you got on at Arkansas City went on to Coffeyville? A. I got on it at Winfield; but I didn't know it went to Coffeyville until it was too. late, or I might have bought a ticket to Coffeyville."

Later the following took place between defendant's counsel and the court:

"Mr. Scovel: Your Honor brought into this case something—I am quite sure that this train that runs through and makes connections to Coffeyville was not running in October, 1946.

"The Court: I didn't say it did.

"Mr. Scovel: Your questions may have left that impression.

"The Court: You can find out what the facts are from the Santa Fe, if they say it didn't go through, I will instruct the jury it didn't go through.

"Mr. Scovel: All right, as soon as I find that out we will rest."

In appellant's brief we note that an investigation was made and it was learned that at the time involved the "Doodlebug" did not run on to Coffeyville. Following receipt of this information the court included in its instructions to the jury the following:

"Gentlemen of the Jury, inasmuch as the statement was made, or I brought out the fact that the 'Doodle Bug' goes to Coffeyville and did then, I want to instruct the jury that the best information I can get from the officers who phoned down there was that the change was made about November 1946, and it is charged in the information that this occurred about October 17th. I don't want the jury to understand that I am saying that the 'Doodle Bug' went to Coffeyville on October 17, 1946, because I don't know whether it goes there now or not."

Appellant argues that while this instruction might have corrected with the jury this unintentional misstatement of fact, it could not remove from the minds of the jurors the fact that the trial judge obviously did not believe the testimony of the defendant. The state contends that the trial court's examination of the defendant was merely directed at determining why the defendant had stopped over in Independence for approximately seven hours rather than remain on the train on which he had arrived in Independence for the purpose of going to Coffeyville inasmuch as the defendant had testified that when he boarded the train at Arkansas City his destination was Coffeyville, and argues that such inquiry was thus directed at a matter which was entirely collateral to any issue of guilt or innocence of the defendant since the defendant did not deny he was in Independence at the time of the burglary. The state further argues that if by any conception it could be stated the trial judge was in error in examining the defendant on this one collateral point, then certainly the error was corrected by his instruction to the jury as above set out.

Our reports are replete with decisions on the question of just how far a trial judge may go in the examination of a witness, particularly a defendant or prosecuting witness in a criminal case. Perhaps no hard and fast rule can be laid down due to the many and varied circumstances in which the question arises. The purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant and it is a part of the business of the trial judge to see that this end is attained, even though in accomplishing the full development of the truth it sometimes becomes necessary for him to examine and cross-examine the witnesses. (*State v. Miller,* 127 Kan. 487, 274 Pac. 245.)

On the other hand, where, in the trial of a criminal case, the judge deems it necessary to cross-examine witnesses, and particularly the defendant, in order to prevent a miscarriage of justice, he must exercise great care to prevent giving the jury the impression that he is biased against the defendant and he must not forget the function of a judge and assume that of an advocate. The same applies with respect to the credibility of a witness and a judge should exercise great care and caution to say nothing within the hearing of the jury which would give them an indication of what he thought about the truth or falsity of any part of the testimony. The credibility of a witness is a matter to be determined by the jury. (*State v. Ridge,* 141 Kan. 60, 40 P. 2d 424.)

We think there can be no doubt but that the questions and remarks of the trial judge created the impression in the minds of the jury that he did not believe the defendant. A juror is prone to watch any indication by the judge as to how he regards any part of the testimony or the credibility of a witness and for that reason a trial judge must scrupulously avoid the slightest indication as to his personal feelings concerning the matter in issue. This being the case, it cannot be said that the giving of the additional instruction cured the evil already done.

This brings us to the question of whether, in view of the whole record, the defendant had a fair trial. As before stated, appellant concedes that there probably is sufficient competent evidence to sustain the verdict of the jury. But, should that be the prime test under the record presented to us for review? The evidence against the defendant was largely circumstantial and can it be said with certainty that the minds of this jury were not influenced by the incompetent and prejudicial evidence admitted over defendant's objection and by the questions and remarks of the trial court? We think not. Be a defendant ever so guilty—nevertheless he is entitled to a fair trial and we cannot find from the whole record in this case that such was accorded him. It therefore follows that it is unnecessary to discuss appellant's other contention with reference to the imposition of sentence under the habitual criminal act.

The judgment of the lower court is reversed with directions to grant a new trial.

ARN, J., not participating.