No. 48,443

The State of Kansas, *Appellee*, v. Michael E. Boyd, *Appellant.*

(563 P.2d 446)

Opinion filed April 9, 1977.

*James W. Wilson*, of Hodge, Wood, and Wilson, of Wichita, argued the cause, and *Ray Hodge*, of the same firm, was with him on the brief for the appellant.

*Stephen M. Joseph*, assistant district attorney, argued the cause, and *Curt T. Schneider*, attorney general, *Vern Miller*, district attorney, and *Stephen E. Robison*, assistant district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal in a criminal action in which the defendant-appellant, Michael E. Boyd, was convicted of murder in the first degree (K.S.A. 21-3401) and aggravated robbery (K.S.A. 21-3427). This case was previously before this court in *State v. Boyd*, 216 Kan. 373, 532 P. 2d 1064. On the first appeal we reversed the case and a new trial was ordered because of errors in the admission of evidence and in the court's instructions. Following the remand the defendant was retried and convicted, and now brings this appeal alleging trial errors at his second trial.

The evidence presented at the second trial was substantially the same as that introduced at the first trial. However, at the second trial the defendant presented the defense of insanity, which was

not a defense at the first trial. Most of the factual circumstances were not in dispute and are essentially as follows: On September 25, 1972, at about 2:34 a.m. a call was received by the Best Cab Company in Wichita, requesting a cab be sent to the 904 Club. Cab No. 43 driven by Gordon Moore was dispatched to the club. According to the state's evidence at about this same time the defendant Boyd was at the 904 Club having a conversation with an acquaintance, James Thomas. Thomas testified that Boyd told him he needed money and was going to rob a cab driver. Thomas thought he was joking. Defendant insisted he was not and said he was going to "hit him over the head." Thomas suggested the driver would hit him back. Defendant insisted he was not joking and said: "I got something for him if he do that." Thomas then observed a Best Cab pull up to the club. Defendant got into the cab which drove away.

At about 3:00 a.m. on September 25, Bobbie Parks heard a noise outside her home at 535 Ohio in Wichita. She heard a moan and then someone crying, "Help, oh please don't, please don't." She awakened her mother and the two looked out the window. They saw a body lying in the street and a cab drive away. The body was that of Gordon Moore. Shortly thereafter defendant was observed parking cab No. 43 on the street. Boyd got out and walked to the corner and began talking with William Knox and another man. Knox testified defendant asked him to take him to the bus depot. They drove to the bus depot and then to a motel. They began drinking and continued to do so until daylight. Defendant Boyd then went to his girlfriend's house where he was arrested later in the day. The state's evidence established a number of highly incriminating circumstances which pointed the finger of guilt directly at the defendant Boyd. Gordon Moore's billfold and a knife were found near his abandoned cab. On the billfold was a latent fingerprint which was identified as that of the defendant Boyd. Boyd's blood type was Group O and Gordon Moore's blood type was Group A. At the time defendant was arrested he had a cut on one of his hands and there was blood on his clothing. Group O and Group A human blood were found in the abandoned cab. At the time defendant was arrested Group A human bloodstains were found on his clothing. The medical testimony established 15 deep knife wounds in Moore's body. No single wound was fatal and the cause of death was determined to be loss of blood.

The defendant took the stand in his own defense. He testified that he had been drinking and taking drugs throughout the day of September 24. He had been at the 904 Club that evening and had called a cab. He had a conversation with James Thomas at the 904 Club but denied making any statements as to robbing a cab driver. Defendant further stated that when he got into the cab there was another person present. The driver began to speak to him in a racially offensive manner. There was an unfriendly exchange of words, followed by the two slapping each other. The defendant then remembered a flash coming before him and throwing up his hand. He claimed to remember little else after that. Contrary to the testimony given at the first trial the defendant testified that the cut on his hand came from a knife in the cab driver's control. The defendant denied having a knife with him in the cab and denied making any plans to rob or kill the cab driver.

The defendant also called witnesses to show that he was addicted to narcotics. The defense then called Dr. C. J. Kurth, a Wichita psychiatrist, in support of the defense of insanity. Dr. Kurth testified that he had examined defendant and diagnosed him as a psychopathic personality with schizoid features. He stated that the defendant had a personality which might become dependent upon drugs or alcohol or both and that such a personality is potentially explosive. Dr. Kurth was then asked a hypothetical question based on the defendant's theory of the case. Assuming that the defendant had taken drugs and consumed alcohol during the day and evening preceding the incident and assuming that the cab driver struck the defendant first, Dr. Kurth was of the opinion that the circumstances could have triggered the defendant's explosive personality so that he would not have been able to distinguish right from wrong at the time the homicide occurred.

On cross-examination Dr. Kurth was presented with another hypothetical question based on the state's theory of the case. This version assumed as a matter of fact that defendant had been drinking, that he told an acquaintance he was going to hit a cab driver on the head and then take the cab driver's money, and the cab driver was later found dead with his pockets pulled out. Dr. Kurth was of the opinion that under those circumstances the defendant would probably have known the nature and quality of

his acts and would have probably known right from wrong. The question of insanity was submitted to the jury who rejected the defense and found the defendant guilty of murder and robbery. Following his conviction the defendant appealed again to this court.

One of the points of error raised is that the trial judge took on the role of prosecutor in posing a certain question to Dr. Kurth after counsel had completed their examinations. Counsel for the defendant in his examination of Dr. Kurth questioned the doctor as to the significance of the 15 knife wounds in Gordon Moore's body. Dr. Kurth stated this would indicate that the defendant was not rational at the time and would support the defense that the defendant was insane. In response to a question from the prosecutor Dr. Kurth indicated that this large number of stab wounds was an indication of overkill since the victim was obviously dead before the completion of the stabbing. After both counsel had stated that they had no further questions, the trial judge posed a single question to Dr. Kurth which the defendant claims was highly improper and prejudicial. The question was as follows:

"Doctor, assuming that a pathologist has testified that those, that no single wound was a deadly wound, would that alter your opinion?"

Dr. Kurth answered that it would change his opinion and that defendant probably intended to "stay with the situation until he had no witness", thus indicating that the defendant knew exactly what he was doing at the time the stabbing took place. Dr. Kurth also stated that the extreme depth of the particular wounds might lead to a contrary conclusion, that is, that the defendant was irrational.

As noted above the defendant contends that the trial court committed reversible error in posing the question to Dr. Kurth. We have stated on a number of occasions that the purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant and it is a part of the business of the trial judge to see that this end is attained, even though in accomplishing the full development of the truth it sometimes becomes necessary for him to examine and cross-examine the witnesses. (*State v. Blake*, 209 Kan. 196, 495 P. 2d 905; *State v. Jones*, 204 Kan. 719, 466 P. 2d 283; *State v. Winchester*, 166 Kan. 512, 203 P. 2d 229; *State v. Miller*, 127 Kan. 487, 274 Pac. 245; and *State v. Keehn*, 85 Kan. 765, 118 Pac. 851.) In recognizing the

right of a trial judge to cross-examine witnesses we have always coupled such recognition with words of warning. In *State v. Winchester*, supra, we stated that where the judge deems it necessary to cross-examine witnesses, he must exercise great care to prevent giving the jury the impression that he is biased against the defendant and he must not forget the function of a judge and assume that of an advocate. The same rule applies with respect to the credibility of a witness and a judge should exercise great care and caution to say nothing within the hearing of the jury which would give them an indication of what he thought about the truth or falsity of any part of the testimony. This admonition was recently repeated in *State v. Jones*, supra. These admonitions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. The judge's attitude and the result he supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice—in many cases without warrant in fact. (*State v. Blake*, supra.)

Since the cross-examination of a witness by a trial judge is fraught with such dangerous consequences, if a trial judge sincerely believes that additional information should be obtained from a witness in order to clarify the evidence and enable the jury to arrive at the true facts, the better practice is for the trial judge to discuss the matter with counsel outside the presence of the jury and request counsel to pose the questions to the witness. Such a procedure will accomplish the full development of the truth without a direct participation by the trial judge in the examination of the witness and hence any question as to the judge's bias may be avoided.

We find nothing in the record in this case to sustain defendant's contention that the judge sought to assume the role of an advocate, nor does it support a contention that the judge created prejudice by spoken words, expression of face, or tone of voice. By a single question the trial judge directed Dr. Kurth's attention to the prior uncontradicted testimony of the pathologist who performed the autopsy that the victim did not die from any one single wound but rather from loss of blood after all the wounds had been inflicted. The judge exercised caution in asking the question. He allowed both counsel to inquire further following his question. In addition he gave an instruction to the jury that he

did not intend, by any of his actions or remarks, to suggest how he would resolve the case. Although as noted above it would have been better procedure for the trial judge to suggest to counsel that the new matter be developed by their questions, we cannot say under the circumstances that the trial judge abused his discretion or that his question directed to Dr. Kurth was reversible error.

The defendant also complains that the trial court erred in giving instruction No. 12 which explained to the jury the effect of a finding of not guilty by reason of insanity in language which paraphrased K.S.A. 22-3428. This instruction was given in conjunction with an instruction defining the defense of insanity. The defendant's objection to the instruction was directed only to the requirement of a 30-day notice to the sheriff, district attorney, and district court prior to release or transfer of a person committed to the state security hospital following acquittal by reason of insanity. The defendant did not object to the balance of the instruction and in fact requested a similar instruction leaving out reference to the 30-day notice provision. Defendant claims the instruction as given caused the jury to speculate that, if it found him insane, he could be released after 30 days. An instruction similar to the one given here was upheld in *State v. Hamilton*, 216 Kan. 559, 534 P. 2d 226. We cannot say that the instruction as given was clearly erroneous or that defendant has shown that he was prejudiced in any way by the submission of the instruction to the jury.

Defendant also maintains that he was prejudiced by the giving of an instruction covering the subject of "temporary insanity" produced by involuntary intoxication. An instruction on the subject of voluntary intoxication was also given. The instruction complained of served to limit the jury's consideration of voluntary intoxication. It is a correct statement of the law and we find no error. (*State v. Harden*, 206 Kan. 365, 480 P. 2d 53.)

In another point the defendant contends that the trial court erred in not giving an instruction on self-defense. Such instruction was not requested by the defendant and in fact the court gave an instruction specifically excluding self-defense to which there was no objection by defendant. A review of the evidentiary record yields no evidence upon which a self-defense instruction could be based. The defendant did not testify that he killed the driver in self-defense. He claimed only that he was insane as a result of drugs and alcohol when he killed the cab driver. We find no error

in the failure of the trial court to instruct on self-defense. We have considered the other points raised on the appeal and find them without merit.

The judgment of the district court is affirmed.