No. 88,650

STATE OF KANSAS, *Appellee,*
v. JOSEPH ANDREW HAYDEN, *Appellant.*

(130 P.3d 24)

Opinion filed March 17, 2006.

*Robert G. Kuchar*, of Jenab & Kuchar, of Olathe, argued the cause and was on the brief for appellant.

*John K. Bork*, assistant attorney general, argued the cause, and *Julie E. Richey*, assistant attorney general, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Joseph Hayden appeals his convictions on one count of murder in the second degree, one count of attempted murder in the second degree, and one count of aggravated burglary.

Hayden raises six issues for our consideration: (1) Did the district judge's behavior during trial constitute misconduct requiring reversal? (2) Should the defense motion to dismiss for violation of Hayden's right to speedy trial have been granted? (3) Did the denial of the defense motion for individual voir dire of venire members violate his Sixth Amendment rights? (4) Should the State have been allowed to amend its complaint 1 day before trial began? (5) Did the district judge err by failing to instruct the jury on the legal effect of a person's mere presence at the scene of a crime? and (6) Was there sufficient evidence to support the convictions?

## Factual Background

This case arose out of the death of Vivian Johnson, age 85, and the serious injury of her husband, Howard, age 86. A man attacked the couple with a shovel in their home very early in the morning on November 1, 2000, and Mrs. Johnson died 18 days later from her injuries. Before her death, neither Vivian nor Howard could pick Hayden out of a photo lineup, and each described the attacker as 5'5" tall.

Suspicion eventually focused on Raymond Fuller, then 25 years old and 5'8" tall, and on Hayden, then 17 years old and 6'2" tall. Each pointed his finger at the other.

Fuller was tried first; he was convicted of attempted second-degree murder of each of the Johnsons and of aggravated burglary. The State agreed to recommend concurrent sentences for his convictions in exchange for his testimony in Hayden's later trial.

Fuller ultimately testified that he drove himself and Hayden around "the hollows," looking for parties. He claimed that he pulled into the Johnsons' driveway because he had to go to the bathroom and was familiar with the couple and their land. While there, Hayden entered the house. Fuller testified that he entered the home to peek at Hayden. He could see Mr. Johnson bleeding, and he heard a clink sound from the back of the house. He then ran out. Hayden followed, dropped something he was holding into the back of the truck the men had borrowed, and then jumped into the passenger seat. Fuller also testified that Hayden said: "I think I killed them."

This version of events departed in several respects from earlier Fuller stories. At his police interview, Fuller initially claimed that he stayed in the truck after Hayden entered the house. When confronted with evidence of his shoeprint inside the house, Fuller said he only stepped into its entryway. From that location, he then said, he could see Hayden's shadow on the wall and was able to observe him raise the shovel and strike something. Fuller also said before trial that Hayden had nothing in his hands when he followed him out of the house.

For his part, Hayden contended that Fuller tried to talk him into robbing the Johnsons and, when he refused, that Fuller stormed

out of the truck and into the house. Hayden asserted that he had stayed in the truck while Fuller was inside and that he did not know what happened until a few days later, when he saw news of the crimes on television.

After the attack on the Johnsons, Fuller and Hayden wrecked the truck. Each claimed that the other stashed the shovel used to beat the Johnsons. After the accident, Fuller and Hayden walked to a house occupied by Fuller's drug dealer.

Hayden eventually left Fuller behind at the dealer's house. Fuller and the dealer used methamphetamine that afternoon, and the dealer eventually testified that Fuller came to her room, crying. When she asked if he and Hayden had been "out robbing somebody," Fuller nodded his head "yes" and told her that "the last thing he heard was: 'Please don't hurt us. We're old.'"

Before their arrest, Hayden and Fuller stayed a couple of days at a friend's house, where they were introduced to John Vincent Cly. Hayden and Fuller asked Cly if he could procure false identification for them. At Hayden's trial, Cly testified that Hayden had been upset and had told him that he did not mean "to get his boy caught up like this" and did not mean "to hurt the old lady." Cly understood Hayden's reference to "his boy" to mean Fuller. Hayden's counsel suggested at trial that an unrelated charge against Cly had been reduced from a felony to a misdemeanor and that his $2,500 bond had been changed to a personal recognizance bond in exchange for his testimony.

Hayden's trial was originally set to begin on July 9, 2001, but the State filed a motion to dismiss. The case was dismissed, and Hayden was released. After the State learned of Cly's likely testimony, the case was refiled. Hayden was arrested again and went to trial on December 11, 2001.

Five days before trial began, the State filed a motion to amend the complaint and information. The district court granted the motion on December 10, 2001, changing an aggravated battery charge to aggravated burglary.

Hayden unsuccessfully requested individual voir dire of the jury venire because of extensive media coverage of the crimes. His counsel argued that "prospective jurors w[ould] have to be inter-

rogated as to the nature of the publicity [to which they had been exposed]. . . . Forthright answers would very likely contaminate the entire venire, and based on the nature of the pretrial publicity, that contamination could not be corrected by mere admonishment." The district judge denied the motion.

On this appeal, Hayden also accuses the district judge of engaging in prejudicial misconduct, arguing the judge "demonstrated a careless, angry, and unprofessional attitude toward most persons involved in the above-captioned case." He cites examples of what he characterizes as interruptions, rudeness, inattentiveness, and hostility in the trial judge's examination of prospective jurors; the judge's continual interruption of both of the lawyers; the judge's distraction from trial by a computer at the bench; the judge's visible and audible anger toward both counsel, including during bench conferences at the bench; and the judge's disrespect toward both parties, witnesses, prospective jury members, and those ultimately selected to serve on the jury. The State does not contest the accuracy of defense counsel's description of the district judge's demeanor and behavior. It does challenge the legal effect, arguing that the judge's equal opportunity misconduct did not prejudice the defense.

## Judicial Misconduct

An appellate court's standard of review is unlimited in cases alleging judicial misconduct. *State v. Patton*, 280 Kan. 146, 181, 120 P.3d 760 (2005); see *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). The merit of allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding the alleged misconduct. In order to warrant a new trial, it must affirmatively appear that the conduct prejudiced the substantial rights of the complaining party. *State v. Patton*, 280 Kan. at 181; see also *Miller*, 274 Kan. at 118 (burden of showing prejudice on party asserting existence of judicial misconduct).

Although we are limited to review of a "cold record," we agree with Hayden and the State that the district judge engaged in misconduct in this case. The record reflects numerous unnecessary interruptions, as well as impatient and rude remarks, made by the

district judge. It also documents, as much as a written record can, the district judge raising his voice and failing to pay attention. We also note that, when the judge's conduct was challenged on Hayden's motion for a mistrial, he did little to defend himself, asserting his behavior had been no "better or worse to [Hayden] than it ha[d been] to the State."

The district judge's pattern of hostility was set early. During a pretrial hearing, he succeeded in cowing both counsel.

"The Court: I am going to deny your motion in limine. I don't believe he can properly cross-examine if there's in fact an agreement and the agreement does provide for some improvement of Mr. Fuller's position.

"[Prosecutor]: I understand he will do that. I am not seeking to prevent that.

"The Court: Well, you don't want him to talk about sentence. You don't want him to talk about what he's been convicted of. How can you discuss that and not discuss how you improved his position on sentencing?

"[Prosecutor]: I am here as I said for guidance from the Court.

"The Court: The guidance is I deny your motion in limine. He may cross-examine him about what he's been convicted of and—

"[Prosecutor]: I can hear you. You do not need to raise your voice.

"The Court: I'm not raising my voice. I'm telling you what my ruling is. Do you have any other preliminary matters, [Prosecutor]?

"[Prosecutor]: No, Your Honor.

"The Court: [Defense Attorney]?

"[Defense Attorney]: No, Judge."

During voir dire, the judge constantly interrupted counsel's questioning of prospective jurors. The judge interrupted the prosecutor 14 times, at least once, cutting him off in mid-sentence.

"[Prosecutor]: And sometimes in order to have a co-defendant testify against the other defendant it is necessary to deal with that co-defendant. And you will hear in this case that there has been a bargain struck. Is there anybody that because of that fact would simply not listen to what the co-defendant had to say?

(No affirmative response was had.)

"The Court: Members of the jury, again you are entitled to give such weight and credit as you desire. You're entitled to give weight and credit to that fact. But does anybody believe that they couldn't make up their minds solely from the facts and not give consideration of all of the evidence presented?

(No affirmative response was had.)

"The Court: You may proceed.

"[Prosecutor]: One thing you often hear about criminal trials is that the defendant is presumed innocent until—

"The Court: Members of the jury, I'm going to give you an instruction that I will undoubtedly give you in this matter."

Defense counsel's experience during voir dire was similar. The district judge interrupted him seven times before defense counsel began to inquire about prior criminal jury experience. When questioning turned to those jurors who had responded initially about their experiences, the judge interrupted to call counsel to the bench. The judge indicated his disapproval of the questioning and told counsel he would allow inquiry only into whether a particular prospective juror had experience in a trial for a violent crime. This exchange followed:

"[Defense Attorney]: Actually I would enjoy inquiring on this panel in my own fashion. While I appreciate the effort you made to obtain a fair and impartial jury, I would like to exercise my statutory right to question this jury.

"I would make an objection to the constant interruption you made while the State was trying to do voir dire and the interruptions you're making now and I would ask that unless there's an objection from the State, you will allow me to conduct a meaningful voir dire.

"As of right now, I've been standing in front of the jury panel five or six minutes and I've been interrupted numerous occasions and I make that request at this time.

"The Court: You have anything you want to say, [Prosecutor]?

"[Prosecutor]: No, Your Honor.

"The Court: I believe it's my active duty to maintain control of voir dire and I will continue to do so.

"[Defense Attorney]: I would ask that you do so in a polite and somewhat non-obtrusive manner if at all possible."

After three more interruptions, the defense attorney attempted to pose a final question to the jury panel, when the judge again interrupted him mid-sentence and called him to the bench.

The district judge also interrupted defense counsel's opening statement in mid-sentence and repeatedly interrupted witness examinations, often rudely. For instance, the judge interrupted questioning of the State's first witness, a paramedic who responded to the Johnsons' home:

"The Court: I am going to remind the State of my direction not to show the exhibit to the jury til such time as you get it admitted.

"[Prosecutor]: I understand that now.

"The Court: Please make sure that you do not do it again."

This sort of admonishment was directed at counsel multiple times throughout the trial. The repeated scoldings took place at the bench, often in a voice loud enough to be heard by the jury, and in open court.

The district judge also repeatedly interrupted and scolded several witnesses. For example, during defense cross-examination of a second paramedic, counsel handed the witness his field notes to refresh his recollection. The judge cut the witness off and ordered him not to read from his notes.

The judge also repeatedly expressed impatience with the speed at which the trial was moving. He was short with witnesses and with counsel. For example, during defense cross-examination of Vickie Eddy, Fuller's drug dealer, Eddy was admonished by the judge for using her notes. Defense counsel then continued:

"[Defense Attorney]: You remember testifying in this murder case at a preliminary hearing in this very courtroom?

"[Witness]: Quite frankly I get very nervous up here and you seem, you know, to make me more.

"[Defense Attorney]: I apologize for that. I'm trying to look for the truth.

"[Witness]: I have no reason to lie about anything.

"The Court: Please answer the questions. Please don't have a dialogue with the witness. Please propound a question."

The judge also interrupted defense counsel's examination of a witness testifying about Fuller's shoeprint:

"[Defense Attorney]: All right. Now about the footprints. If I could ask you, I'm showing you State's Exhibit Number 27. What size are those shoes if you know?

"The Court: If you're just looking at them to identify it and it does not require expertise, do not so do. If you remember you may testify from your recollection.

"Witness: I do not recall, Your Honor.

"[Defense Attorney]: If I could have you look at State's Exhibit Number 27 and tell us what size those shoes are?

"The Court: Is there an identifying mark? Please bring the exhibit to me.

(Counsel did as requested.)

"The Court: I don't believe any expertise is necessary.

"[Defense Attorney]: I'm asking him as a regular witness to figure out if he can tell us what size those shoes are.

"The Court: The exhibit is admitted. It does not require his expertise to admit that.

"[Defense Attorney]: Actually, if I can make a record on that please?

"The Court: Approach.

(The following proceedings were had at the bench by the Court and counsel out of the hearing of the jury.)

"The Court: State your reason.

"[Defense Attorney]: Judge, I want to ask this witness what size those shoes are. I want to compare that to the size that he diagnosed as being on the linoleum. Only he can do that. I'm requesting this expert witness to testify what size of shoes made that print that's [sic] he's looking at. I don't see what the problem is. It's going to be one quick question.

"[Prosecutor]: I have no objection.

"The Court: You may inquire as to what size they are."

The judge also interrupted the prosecutor's examination and defense counsel's cross-examination of Fuller, easily the most important witness in the case. When the State elicited information about a rap CD Hayden had purchased, the defense objected unsuccessfully. The prosecutor then asked Fuller to repeat the name of the album, and the judge interrupted: "You asked him the name once. Please proceed. He didn't—doesn't need to repeat it."

Because the height of the perpetrator was a critical issue in the case, during cross-examination, defense counsel asked Fuller to stand up, which he did. The district judge again interrupted:

"The Court: This witness is testifying. Please approach. Mr. Fuller, you can be seated.

(The witness did as requested.)

"The Court: Mr. Hayden, you can stay there or come up next to the bench.

(The following proceedings were had at the bench by Court and counsel out of the hearing of the jury:)

"The Court: Now, go ahead.

"[Defense Attorney]: I'm sorry, I don't know what I'm here for.

"The Court: Why [sic] do you need him to stand up for?

"[Defense Attorney]: I would like to have him stand up and Mr. Hayden stand up.

"The Court: Now you're asking something. Do you have any objection only to that?

"[Prosecutor]: No, I have no objection.

(Thereupon, the following proceedings continued in the hearing of the jury.)

"The Court: You may be seated.

"[Defense Attorney]: Now, Mr. Fuller, before you sit down—

"The Court: No, you're not. Mr. Fuller, you can be seated.

(The witness did as requested.)

"[Defense Attorney]: Could we approach?

"The Court: You can approach.

(The following proceedings were had at the bench by the Court and counsel out of the hearing of the jury:)

"[Defense Attorney]: Judge, I want the record to reflect you have been basically continuing to raise your voice for no apparent reason. I'm standing eight or ten feet from you. I have perfectly good hearing.

"The Court: I made—

"[Defense Attorney]: If I can make a record with all due respect. I can hear you perfectly well. Your tone of voice is disrespectful. It's rude. It's loud. It's something that the jury can certainly hear. I think it's impacting the way they're viewing the evidence and I want to state that for the record.

"The record may not reflect the tone of voice and the loudness of the voice and the fact that the jury is about ten feet from your left, and they can hear the way you're commenting on the proceedings and I want to state that for the record.

"What I was going to ask is I was going to ask Mr. Fuller to take a look at Mr. Hayden and ask if he can estimate how much taller Mr. Hayden is. You've interfered with that. The point is missed and lost so I'm not—unable to do that."

After the court called a recess the defense moved for mistrial based on the judge's misconduct. The district judge denied the motion.

Later, the judge stated the defense was mischaracterizing the contents of a document and denied admission of the document as an exhibit. The judge then permitted the defense to make a record, and the following exchange ensued:

"The Court: Keep your hands off my desk. I'll take care of the things on my desk.

"[Defense Attorney]: I am not mischaracterizing anything. My understanding of that document is that it talks about arrest for forgery and out of state warrant. That's my reading of the thing. There might be some explanation for it, but I read a lot of arrest reports and that's my understanding of why the person was arrested. So I don't think you should be telling the jury that mischaracterizes the evidence.

"The Court: I sustain the objection to the document."

At the end of a long day, the prosecutor successfully sought a bench conference.

"[Prosecutor]: I believe that was our last witness, Your Honor, and what I—I would really like to just call it a day for now.

"The Court: The State will call its next witness or we'll recess. We'll go according to whichever you do.

"[Prosecutor]: Could we just quit today? I truly am exhausted.

"The Court: The State will call its next witness and we will hear the witness or you'll rest and we'll recess for the day."

Later in the trial, the district judge also interrupted the defense counsel's examination of Cly and admonished the defendant several times during his testimony.

At other times during the trial, the district judge was inattentive. Among other things, he had to be reminded that one of the victims, Vivian Johnson, who had died as a result of injuries inflicted during the attack, would not be testifying.

The judge's behavior was outlandish enough to prompt more than fifteen observers to approach Hayden's counsel to express their unsolicited disappointment at the court's lack of respect toward the litigants and witnesses. When defense counsel asked the district judge to include the names and contact information for these observers in the record, the request was denied.

Hayden's motion for a new trial also was denied. The motion for new trial summarized the judge's performance in the following language:

"The court's disruptive and discourteous conduct throughout the trial in the above captioned case deprived the defendant of his constitutional right to a fair jury trial. Before jury selection and until the verdict was announced the court demonstrated a careless, angry, and unprofessional attitude toward most persons involved in the above-captioned case. The court acted with apparent hostility towards the prospective jury, the jury, the prosecutor, the undersigned counsel, most of the witnesses, and the defendant. Throughout the trial the court interrupted the proceedings on numerous occasions. Several of the court's interruptions were not at the request of either party. The court repeatedly, unilaterally, decided to interject its comments during voir dire examination, testimony of witnesses, and arguments of counsel. Most, if not all of the court's comments, were communicated with such apparent anger, hostility, and disrespect that it caused considerable distraction for the jury, the parties, and the witnesses. The tone and volume of the court's voice clearly created an atmosphere in which it would be difficult, if not impossible, for the jury to carefully consider the facts of this case. The court's needless interruptions of the trial proceedings created an atmosphere in which the defendant was unable to exercise his constitutional right to select a fair and impartial jury, constitutional right to confront and cross-examine the witnesses testifying against him, and his constitutional right to testify in his own behalf. The court's behavior violated its obligations under Kansas Supreme Court Rule 610A Canon 3B.

"The trial transcripts will of course reflect all of the court's comments made to both parties in this case. Unfortunately, the transcripts will not reflect the court's demeanor as it was making its rulings and comments. The court's demeanor is of vital importance in analyzing this request for a new trial. While the court was addressing the attorneys involved in this case on most occasions, including seemingly minor and trivial issues, its tone of voice displayed unnecessary frustration and anger; the volume of the court's voice exceeded acceptable and professional limits for a conversation occurring in a court of law; when the court spoke its facial expressions could only be construed as displaying contempt toward the target of the communication; and the court's body language frequently consisted of the court shaking somewhat uncontrollably as it would attempt to express itself."

At the hearing on Hayden's motion for new trial, and again before this court, the prosecutor has no argument with defense counsel's description of the trial judge's behavior. The prosecutor's candor is most admirable. Likewise, defense counsel has behaved responsibly and admirably in agreeing with his adversary that the district judge's misbehavior was directed at both sides. The question, of course, is the legal effect of these admissions.

The State asserts that the absence of obvious bias in its favor is equivalent to an absence of legal prejudice to the defendant's substantial rights. The defense, in turn, asserts it was prejudiced despite the judge's lack of obvious bias toward the State. Hayden argues that it was he who was on trial, and it was he whose right to a fair trial was denied because of the atmosphere of fear and intimidation the judge created for all involved.

The State's position has the weight of precedent behind it. See *State v. Patton*, 280 Kan. 146, 181-82, 120 P.3d 760 (2005); *Miller*, 274 Kan. 113, Syl. ¶ 3, 49 P.3d 458 (2002). In the past, this court has reversed a conviction and remanded for new trial only when a judge's misconduct would have made him or her appear less than impartial. See *Miller*, 274 Kan. at 119 (in addition to rudeness, sarcasm toward both sides, judge disregarded testimony of defense witness as meaningless); *State v. Plunkett*, 257 Kan. 135, 143, 891 P.2d 370 (1995) (judge showed confidence in prosecutor, suspicion toward defense counsel; posed question slanted toward State; interrupted opening statement of defense; interjected belief regarding testimony); *State v. Hamilton*, 240 Kan. 539, 547, 731 P.2d 863 (1987) (judge commented on evidence, interrupted defense coun-

sel); see also *State v. Sampsel,* 268 Kan. 264, 997 P.2d 664 (2000) (despite crude undignified comments about victim, no showing of prejudice or partiality; no judicial misconduct); *State v. Minor,* 268 Kan. 292, 997 P.2d 48 (2000) (same); *State v. Mayes,* 33 Kan. App. 2d 9, 14, 98 P.3d 294 (2004) (Supreme Court reversals based on judicial misconduct follow "overtly biased and prejudicial" comments, behavior); *State v. Simpson,* 29 Kan. App. 2d 862, 32 P.3d 1226 (2001) (judge exalted the weight of State's theory of identity in close case); *State v. Chappell,* 26 Kan. App. 2d 275, 281, 987 P.2d 1114 (1999) (judge improperly bolstered credibility of State's primary witness, prejudicing defendant). We have not previously granted relief to a defendant without a showing that the judge engaged in conduct or speech demonstrating a bias in favor of the prosecution.

We conclude, however, that such obvious bias is not the only way in which judicial misconduct can cause prejudice to a criminal defendant's substantial right to fair trial. A trial infected with intimidation and fear also is unfair to the person whose freedom is at stake. And the fact that the State's ability to present its case was impaired as well does not excuse or diminish the prejudice caused a defendant by a judge's misbehavior.

As we have often observed, our federal and state constitutions do not entitle a criminal defendant to a perfect trial, but they do entitle him or her to a fair one. See *State v. Manning,* 270 Kan. 674, 692, 19 P.3d 84 (2001). This is true even when that defendant stands accused of unspeakably horrendous crimes. It is our view that this defendant did not get a fair trial.

In *State v. Starbuck,* 239 Kan. 132, 134, 715 P.2d 1291 (1986), this court stated:

"Canon 3 of the rules relating to judicial conduct requires that a judge be patient, dignified, and courteous. 235 Kan. clxiii. A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law. He should exercise restraint over his conduct and utterances. If it becomes necessary during a proceeding for the judge to comment upon the conduct of witnesses, counsel or the testimony, he should do so in a firm, dignified and restrained manner, avoiding repartee and refraining from unnecessary disparagement of persons or issues."

The Code of Judicial Conduct specifically requires that a judge "be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." Rule 601A, Canon 3 B(4), (2005 Kan. Ct. R. Annot. 562). "[I]t should constantly be borne in mind that courtesy is not only a privilege which a judge *may* extend to counsel, witnesses, jurors and litigants, but it is a *duty* which he [or she] owes to the humblest member of the public." *Etzel v. Rosenbloom*, 83 Cal. App. 2d 758, 764, 189 P.2d 848 (1948).

In *State v. Miller*, 274 Kan. 113, we emphasized the importance of these precepts to a criminal trial judge's behavior:

"The trial judge is not merely a moderator but is the governor of the trial. The judge should strive to conduct the trial in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant. The judge should be the exemplar of dignity and impartiality, should exercise restraint over judicial conduct and utterances, should suppress personal predilections, and should control his or her temper and emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict and should avoid conduct which tends to demean the proceedings or to undermine the judge's authority in the courtroom. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, the judge should do so in a firm, dignified and restrained manner, avoiding repartee, limiting comments and rulings to what is reasonably required for the orderly progress of trial, and refraining from unnecessary disparagement of persons or issues. [Citations omitted.]" *Miller*, 274 Kan. at 128.

We also quoted the Indiana Court of Appeals:

" 'Sarcasm and ridicule emanating from the bench in a criminal trial are destructive weaponry. They contaminate the trial. Their use by the trial judge may have an incalculable adverse effect on the administration of justice, which is all the more devastating because the negative is often more difficult to prove than the positive. Whether directed at the prosecution or the defense or both, intimidated participants in the trial may be unable to perform their proper function— a cowed defense counsel fails to object to inadmissible evidence—a rattled witness becomes incoherent. One such occurrence may thwart justice. If such adverse effects can be demonstrated, the error created will be reversible for denial of due process of law.' " *Miller*, 274 Kan. at 126-27 (quoting *Dixon v. State*, 54 Ind. App. 603, 620, 290 N.E.2d 731 [1972] [citing *State v. Lawrence*, 162 Ohio St. 412, 123 N.E.2d 271 (1954)]).

Hayden's trial was presided over by a district judge who was intrusive, rude, and sarcastic. The judge's misconduct did not consist of an isolated comment or action; it was pervasive. It comes through clearly, even on the printed page. We have no doubt that this behavior thoroughly polluted the trial, affecting the performance of all concerned.

We have previously admonished judges to be sensitive to their grave responsibilities in the courtroom. See, *e.g.*, *State v. Boyd*, 222 Kan. 155, 159, 563 P.2d 446 (1977); *State v. Blake*, 209 Kan. 196, 202-06, 495 P.2d 905 (1972); *State v. Jones*, 204 Kan 719, 733, 466 P.2d 283 (1970). These admonitions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance and may find it even when it is not intended. The judge's attitude and the result he or she supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice. *Boyd*, 222 Kan. at 159. The district judge in this case blatantly disregarded these admonitions.

Moreover, the defense is correct that it was Hayden who stood to lose, Hayden whose right to due process was infringed, even if the district judge's misbehavior was directed at both sides. The fact that the State's case was also damaged does not erase the prejudice to Hayden's effort to defend himself in what may otherwise have been a close case. See *State v. Johnson*, 27 Kan. App. 2d 921, 926-28, 11 P.3d 67 (2000). Neither of the victims here could identify the perpetrator. Physical evidence placed Fuller rather than Hayden in the Johnsons' home. Among the other deleterious effects of the judge's behavior was limitation of Fuller's cross-examination. This segment of the trial was particularly critical, and the ability of the system to do reliable justice was impaired.

Under these circumstances, Hayden's convictions must be reversed and the case remanded for new trial before a different district judge. We address his remaining issues only insofar as they may recur on or arise in retrial.

## Speedy Trial

Whether a defendant's constitutional right to a speedy trial has

been violated is a question of law over which this court has unlimited review. *State v. Davis*, 277 Kan. 309, 330, 85 P.3d 1164 (2004).

Hayden does not argue that his statutory right to a speedy trial was violated. He relies only on his constitutional right to speedy trial, citing *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972).

Hayden submits that the State violated his constitutional rights by waiting until July 3, 2001, to move to dismiss its initial charges. He asserts that "it was abundantly clear the State did not have evidence against . . . [him] that could be admitted at trial" after his first preliminary hearing and that the State should have requested dismissal then. He argues that the "State must be held accountable for the decision to file charges without any evidence, to proceed to preliminary hearing without any evidence, and to wait over eight months to finally advise the Court that it did not have any evidence against Hayden."

The State argues that the delay between the crime and the trial, from November 1, 2000, until December 11, 2001, was not unduly long and relies in part on the fact that the statutory time limit was met.

The *Barker* balancing test was adopted in Kansas in *State v. Otero*, 210 Kan. 530, 502 P.2d 763 (1972). It requires this court to consider (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. We have also held that, "[u]ntil the delay rises to the level of being presumptively prejudicial, it is not necessary to inquire into the other *Barker* factors." *State v. Mann*, 274 Kan. 670, 701, 56 P.3d 212 (2002).

In *Mann*, the delay between arrest and trial was approximately 7 months, which did not qualify as presumptively prejudicial; we did not go on to consider the *Barker* factors. See *Mann*, 274 Kan. at 701; see also *State v. Green*, 260 Kan. 471, 920 P.2d 414 (1996) (15 months between filing of complaint, trial; 1-year delay between arraignment, trial; no presumptive prejudice); *State v. Hill*, 257 Kan. 774, 779, 895 P.2d 1238 (1995) (less than 11-month delay not presumptively prejudicial); *State v. Goss*, 245 Kan. 189, 193, 777 P.2d 781 (slightly more than 1-year delay not presumptively prej-

udicial). We have resisted using our previous cases to set a specific time limit. See *State v. Weaver*, 276 Kan. 504, 507, 509, 78 P.3d 397 (2003). Rather, the *Barker* balancing test is applied on an ad hoc basis " 'in which the delay in each case is analyzed according to its particular circumstances.' " *Weaver*, 276 Kan. at 509. The "tolerable delay for an ordinary crime is less than for a complex one." *Weaver*, 276 Kan. at 511.

In *Weaver*, the State's case against the defendant was "simple and straightforward," consisting of one count of possession of cocaine with intent to sell. The defendant was "not arraigned until 123 days after his arrest, and another 176 days passed before Weaver's counsel asked for and was granted a continuance of the trial date. Two hundred and ninety-nine days passed in which no attempt was made to try the defendant." *Weaver*, 276 Kan. at 511. This court found that this was an intolerable delay, but, after considering the other *Barker* factors, held that Weaver's constitutional right to a speedy trial was not violated. 276 Kan. at 512.

By comparison, in Hayden's case, a delay of 13 months between the crime and the trial is not presumptively prejudicial. This was a difficult murder case with very little physical evidence, and the suspects were implicating one another. See *State v. Mathenia*, 262 Kan. 890, 942 P.2d 624 (1997) (23-month delay not prejudicial where case was exceedingly complex). The trial occurred as soon as the State could gather the evidence it needed to proceed. Hayden was out of jail for part of that time. We hold that the 13 months between the crime and the trial and the slightly more than 5 months between the first arraignment and the final hearing constituted "tolerable delays." They were not presumptively prejudicial. We therefore do not move to consider the other *Barker* factors. There was no violation of Hayden's constitutional right to a speedy trial.

## Individual Voir Dire

The "purpose of voir dire examination is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality." *State v. Manning*, 270 Kan. 674, 691, 19 P.3d 84 (2001). Generally the nature and scope of the voir dire examination is

entrusted to the sound discretion of the trial court. *Manning*, 270 Kan. at 691. However, " '[i]n determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate tribunals have the duty to make an independent evaluation of the circumstances.' " *State v. Aikens*, 261 Kan. 346, 366, 932 P.2d 408 (1997).

Judicial discretion is abused when judicial action is "arbitrary, fanciful, or unreasonable," which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Hayes*, 258 Kan. 629, 631-32, 908 P.2d 597 (1995).

In *Aikens*, two defendants joined in the appeal on the issue of individual voir dire. *Aikens*, 261 Kan. at 364. One of the defendants was a black man; the victim was a white man. The crime occurred in Johnson County, a predominantly white county. *Aikens*, 261 Kan. at 364. The case received an extensive amount of media coverage, and the defendants requested individual voir dire to gather information on the potential prejudice of venire members so that any prejudicial statements would not be made in front of others. *Aikens*, 261 Kan. at 364-65. The court "warned the potential jurors not to blurt out any information that they might have about the case [and] . . . encouraged the potential jurors to approach the judge individually at the bench if they had racial prejudices which they did not want to express out loud." *Aikens*, 261 Kan. at 365. One potential juror did approach the judge and was dismissed; this court noted that the other potential jurors could "see how easy it was to tell the judge, on an individual basis, that they could not be impartial due to their prejudices." *Aikens*, 261 Kan. at 367-68. We upheld the district court's denial of individual voir dire.

*Aikens* cited *State v. Shannon*, 258 Kan. 425, 432-34, 905 P.2d 649 (1995), in which individual voir dire also had been requested and denied. In *Shannon*, the defendant was on trial for shooting a doctor who ran an abortion clinic. The district court denied defendant's motion for individual voir dire, and this court upheld that decision partly because the district court left open the possibility

of allowing individual voir dire if an actual need was demonstrated during jury selection. This court also held that the mere possibility of taint did not prevent the defendant's counsel from questioning the venire about pretrial publicity. In addition, there was no showing the potential jurors would have been more honest if they had been questioned separately. *Shannon*, 258 Kan. at 432-33.

Here, the district judge cautioned jurors to tread carefully so that other potential jurors would not be prejudiced by intemperate comments. The judge asked very specific questions so that venire members did not blurt out unnecessary prejudicial information, and he dismissed jurors who said they could not put what they had seen or heard in the media out of their minds to decide the case impartially. Hayden's attorney did not request the procedure employed in *Aikens*—which allowed any juror with a particular prejudice to talk to the judge privately—although he could have done so.

Based on our independent evaluation of the circumstances of this case, we conclude that the district court did not abuse its discretion by denying defendant's motion for individual voir dire.

### Amendment of Complaint

K.S.A. 2004 Supp. 22-3201 governs pretrial procedures relating to the charge. Subsection (e) states in pertinent part: "The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." Our case law has consistently affirmed the language of this statute by holding that "[a] trial court may allow an amendment to an information in its discretion both as to form and substance after arraignment and plea before commencement of the trial." *State v. Woods*, 250 Kan. 109, 113, 825 P.2d 514 (1992); *State v. Osburn*, 216 Kan. 638, 641, 533 P.2d 1229 (1975).

"This court . . . 'distinguish[es] between amendments before trial and those which are made during the course of the trial.' " *Woods*, 250 Kan. at 114. "Although the statutory language has changed since the inception over a century ago of statutory authorization to amend a complaint, this court consistently has given

the State considerable latitude in amending a complaint before trial . . . error will be found only if the defendant's substantial rights are prejudiced." *Woods*, 250 Kan. 114-15; see also *State v. Rasch*, 243 Kan. 495, 499, 758 P.2d 214 (1988) (error in citation not grounds for dismissal of charging document, reversal of conviction if error did not prejudice defendant).

Hayden argues that his rights were prejudiced because amendment of the complaint required him to change his defense strategy. He suggests that the crime of aggravated battery would have required proof that he made physical contact with the Johnsons, whereas the crime of aggravated burglary did not require the State to prove he made such contact.

The State argues that the amendment was necessitated by a simple clerical error. The original complaint stated in Count I: "That on or about November 1, 2000, Joseph Andrew Hayden, in Franklin County, Kansas, did, contrary to the statutes of the State of Kansas, unlawfully . . . kill another human being, Vivian C. Johnson, while in the commission of . . . an inherently dangerous felony as defined in K.S.A. 21-3436(10), aggravated battery." Count III of the original complaint charged Hayden with an underlying felony of aggravated burglary rather than aggravated battery. The State's Motion to Amend sought only to change the aggravated battery language of Count I to correctly reflect the aggravated burglary language of Count III.

There was no prejudice to Hayden's rights. The original charging document put him and his counsel on notice through Count III and through the statute number in Count I that they would need to defend against an allegation of aggravated burglary. The amendment to the complaint actually reduced the number of felonies alleged by the State. It was technical, rather than substantive, in nature. No repeat of his preliminary hearing was necessary.

*Instruction on Mere Presence*

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting

the instruction." *State v. Gholston*, 272 Kan. 601, 615, 35 P.3d 868, *cert. denied* 536 U.S. 963 (2002).

However, " '[e]rror cannot be predicated on a district court's refusal to give a specific instruction where the instructions given cover and include the substance of the instruction refused.' " *State v. Pink*, 270 Kan. 728, 738, 20 P.3d 31 (2001).

Hayden argues the jury should have received a defendant's instruction that mere presence at a crime scene is insufficient to convict, because his sole defense was that he stayed in the truck and did not participate in the crime.

We disagree. The instructions given to Hayden's jury included a pattern instruction on the necessity of finding intentional conduct. In addition, Hayden was not prevented from arguing that his mere presence at the crime scene was insufficient. There was no error on the evidence in Hayden's first trial. See *Pink*, 270 Kan. at 739. On retrial, this issue may need to be revisited.

## Sufficiency of the Evidence

Finally, Hayden also challenges the sufficiency of the evidence. Our standard of review requires us to determine whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found Hayden guilty beyond a reasonable doubt. See *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005). "On appeal, [this court does] not reweigh the evidence, pass on the credibility of witnesses, [or] resolve conflicts in the evidence." *State v. Washington*, 275 Kan. 644, 668, 68 P.3d 134 (2003).

Hayden argues that (1) there was no physical evidence to place him inside the Johnson residence; (2) the Johnsons could not identify Hayden in a photographic lineup; (3) the Johnsons described their attacker as 5'5" tall, and Hayden is well over 6', while Fuller is 5'8"; (4) the State relies on Fuller's testimony, which changed numerous times and was given pursuant to Fuller's favorable sentencing agreement; and (5) Hayden was unfamiliar with the area, while Fuller was familiar with the location and the victims.

The State had an eyewitness, Fuller, who testified that he saw Hayden commit the crime. In addition, Cly testified that Hayden

said he had not intended to get his "boy," Fuller, involved in the crime, nor intended to hurt the "old lady." The State also presented evidence that Hayden hid for a few days after the crime and sought false identification from Cly.

All of this evidence, when taken in the light most favorable to the prosecution was more than sufficient to support Hayden's conviction. We therefore reverse and remand, rather than reverse outright.

Reversed and remanded.

GERNON, J., not participating.

McFARLAND, C.J., concurring in part and dissenting in part: In *State v. Patton*, 280 Kan. 146, Syl. ¶ 21, 120 P.3d 760 (2005), we held:

"Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. **The mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment.**" (Emphasis added.)

The majority opinion cites *Patton* as the yardstick to be applied in determining judicial misconduct issues. Interestingly, the majority opinion omits citation of the significant third sentence of the *Patton* test (shown boldfaced herein). *Patton* is not an ancient case; the opinion was filed in September 2005. The rationale is consistent with a long unbroken series of cases, as recognized in the majority opinion. As the majority opinion correctly notes, this court has previously "reversed a conviction and remanded for a new trial only where a judge's misconduct would have made him or her appear less than impartial."

Although I strongly disapprove of the trial judge's conduct in this case, reversal of the convictions and remand for a new trial are not legally justified under the *Patton* test and all of our prior cases.

Both parties agree that the trial court's rudeness and inappropriate conduct were impartial—exhibiting no bias in favor of the State or against the defendant. Contrary to the yardstick set forth

in *Patton*, the facts do not "affirmatively appear" to have prejudiced the defendant. As noted in *Patton*, the mere possibility of prejudice is not sufficient to overturn a verdict.

The majority opinion cites page after page from the trial transcript of examples of the judicial conduct herein, and then makes some generalized speculations as to the atmosphere engendered thereby. The only reference to any specific conduct requiring reversal is the following:

"Among the other deleterious effects of the judge's behavior was limitation of Fuller's cross-examination. This segment of the trial was particularly critical, and the ability of the system to do reliable justice was impaired."

The record on this matter, as cited in the majority opinion, shows the trial court refused to allow defense counsel to have Fuller express his opinion as to how much taller defendant was than Fuller. Both men were in the courtroom at the same time and the jurors could decide this without Fuller's guess as to any height differential. Presumably the point of this line of questioning was which man better fit the height description of assailants given to the police by the victims. It is difficult to understand how the majority opinion could conclude this area of questioning was "particularly critical."

The main thrust of the rationale expressed in the majority opinion appears to be aimed at punishing the judge for his inappropriate conduct and admonishing other judges against engaging in like conduct. Neither is a legitimate basis for reversal of the conviction herein under *Patton* and all of our prior case law.

Kansas has a procedure for determining whether judicial misconduct has occurred and imposing sanctions including removal where appropriate. A complaint may be filed with the Commission on Judicial Qualifications. The complaint is investigated, and a hearing held where necessary, to determine the facts. If the panel deems discipline is warranted, the panel makes recommendation as to discipline to the Supreme Court. See Supreme Court Rule 602 (2005 Kan. Ct. R. Annot. 584).

The brutal home invasion herein involving the beating of an elderly couple with a shovel is a horrendous crime. The wife lingered for 18 days before dying from her injuries. Displeasure with

a trial judge's conduct which has not been affirmatively shown to have prejudiced the defendant's rights is no basis for reversal of the jury's verdict herein. I would affirm the convictions.

LUCKERT, J., joins in the foregoing concurring and dissenting opinion.