NOT DESIGNATED FOR PUBLICATION

No. 119,633

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of Z.E.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed February 22, 2019. Affirmed.

*Geri L. Hartley*, of Nicholson, Dasenbrock & Hartley, LC, of Paola, for appellant natural mother.

*Rebecca S. Craig*, assistant county attorney, *Elizabeth Sweeney-Reeder*, county attorney, and *Steven M. Ellis*, guardian ad litem, for appellee.

Before BUSER, P.J., POWELL, J., and STUTZMAN, S.J.

PER CURIAM: After an evidentiary hearing on a motion by the State at the end of a two-year child in need of care case, the Miami County District Court terminated L.E.'s (Mother) parental rights to Z.E. Mother appealed and claims error by the district court in three areas. We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

Z.E. is a female child, born to Mother in 2010. In March 2016, the Osawatomie office of the Department for Children and Families (DCF) was assigned a report that Sean C. committed acts of domestic violence against Mother, with whom he was in a relationship. Interviewed by a DCF child protection worker on March 29, 2016, Z.E. told of an incident when she and her mother were in their car. Z.E. said Sean pulled on the

1

glass part of one of their car's windows until it broke and "glass went everywhere." She told the worker she had been afraid Sean would kill Mother. Z.E. said she and Mother were not supposed to be around Sean and had to lie to her "aunt" any time they spent time with him.

In a later interview with DCF workers, Mother confirmed the reported events of the domestic violence incident, which included Sean breaking the car window and pulling her hair, and an attempt by Z.E. to intervene that led to Sean pushing Z.E. into the back seat of the car. Mother said she loved Sean and "believe[d] in him" and did not think he should be punished for having mental illness, meaning she did not want to end her relationship with him just because he heard and saw things that were not really there and lost his temper for no apparent reason.

The March 2016 contact was not the first between the family and DCF. In June 2014, DCF investigated a concern that Mother had taught Z.E. to tell their neighbors to pay her $10 per day or she would kill them. And in December 2015, DCF investigated a report Mother and Z.E. were told to leave a homeless shelter where they were living because Mother sneaked her cat into the facility.

DCF received a further report in February 2016, when Sean and Z.E. were at a Taco Bell in Olathe. The Olathe Police Department had investigated a report that Sean appeared to be under the influence and attempted to drive away from the Taco Bell with Z.E. in the car. A DCF social worker interviewed Z.E. about that incident. She told the social worker that Sean had taken her to Taco Bell, but then she did not know where he was. Z.E. said because she sat at a table for a long time and did not know where Sean was, she became scared. She went to the counter to ask whether they knew where he was. Z.E. said when Sean reappeared he had trouble walking and could not find his wallet. She said the police came and she had to sit for a long time in the police van. On March 23, 2016, the DCF social worker did a follow-up interview with Mother concerning the

2

incident. Mother told her she thought Sean was a "paranoid schizophrenic" and a medication change was the reason for his behavior. She said she had been called by police and went to the Taco Bell. She picked up both Z.E. and Sean. She also reported she had ended her relationship with Sean to focus on caring for Z.E. Mother admitted being asked to leave two homeless shelters—because of the cat and because of her relationship with Sean—and said she was living temporarily with her cousin, Kelli C. Mother told the social worker she had been diagnosed with bipolar disorder but did not take medication because of the way it made her feel. The worker provided her with resources for counseling and medication evaluation, which Mother said she would utilize.

Kelli, whom Z.E. referred to as "aunt," reported she had let Mother and Z.E. live with her after Mother was ordered out of a second homeless shelter with the sole stipulation that Mother discontinue her relationship with Sean because of their history of violence. Kelli reported continuing to try to help Mother in spite of violations of the condition placed on her. After the incident with Sean on March 27, however, she asked Mother to leave her home.

On April 18, 2016, the State filed a petition alleging Z.E. was a child in need of care (CINC), based on concerns for Z.E.'s safety because of Mother's continued relationship with Sean, as well as the failure of efforts to assist Mother through the homeless shelters and mental health resources that were offered but not used. The district court issued an order placing Z.E. in DCF's temporary custody and directing that Sean have no contact with Z.E. Following an evidentiary adjudication hearing, the district court found Z.E. was a CINC.

A case plan was developed with a number of tasks for Mother, including obtaining and maintaining appropriate housing and gaining a stable income and transportation, with proof of required insurance. Mother further was tasked with: completing budgets as requested by her case workers at KVC; engaging in mental health services and domestic

violence support groups or classes; obtaining a psychological evaluation and parenting evaluation; submitting to drug screens; and having no contact with Sean. Chauncey Hester, a permanency case manager for KVC, tracked Mother's progress with the case plan and prepared court reports.

In the two years between the filing of the State's petition and the hearing on the State's motion to terminate parental rights, Mother cycled through a number of housing situations. As of September 22, 2016, when KVC (DCF's contractor) filed a report with the district court, Mother had housing, with Catholic Charities paying her rent through October 1, 2016. Unfortunately, in early 2017 a fire caused Mother to lose her place to live, and for the next several months, she was homeless. She lived in her car, with friends, an Oxford House, and SAFEHOME, a domestic violence shelter. After losing her spot at SAFEHOME, Mother stayed in a friend's garage. She then got a job and a room to live in at a Rodeway Inn but lost that job. After a brief stay with her aunt, she moved into a church, where she continued to live at the time of the termination hearing. Not long before the termination hearing, Mother was approved for a housing voucher and needed to find a place to live that would accept the voucher. The voucher was worth $1200 per month, to be used for up to a three-bedroom residence.

Mother had a similar experience at maintaining stable employment. She was fired from five jobs during the pendency of the case. At the time of the termination hearing Mother was employed at a job where she had worked for two to three months. Over the course of the case, Mother only provided Hester with pay stubs twice, first around September 2017 and then two weeks before the termination hearing. As a result, she was unable to complete budgets with Hester to monitor and assist with financial stability.

Transportation also proved to be a persistent issue for Mother. As of September 22, 2016, Mother had a car and had provided proof of insurance to KVC. She also, however, had a second car which did not have current registration and was uninsured.

The November 2016 and January 2017 KVC court reports stated that Mother nonetheless drove that uninsured car. Mother committed a traffic offense and missed her court date, which led to her spending time in jail. Her car also was impounded. Mother was incarcerated again in October 2017 for driving on a suspended license. The transportation issues occasionally caused Mother to be late to visits with Z.E. Mother never provided Hester with documentation that she acquired insurance or had her driver's license reinstated.

The substance abuse case plan goal also proved to be problematic for Mother. Up to mid-September 2016, Mother provided negative drug screens. However, she failed to provide urine samples for two tests between November 2016 and January 2017, and in February 2017, Mother twice tested positive for methamphetamine. Following the failed drug tests, the district court added a condition to Mother's case plan: she could only visit Z.E. after testing negative for two consecutive weeks. Failure to meet that condition meant Z.E. at times went weeks without visits from Mother. During the remainder of the case, Mother tested positive for methamphetamines or failed to show up for testing more than 10 times. Mother questioned the validity of the tests and denied using methamphetamine.

In February 2018, the State filed a motion to terminate Mother's parental rights. The State alleged Mother had failed to complete several of her case plan tasks, including failing to obtain and maintain stable income, housing, and transportation and failing to follow recommendations of her mental health providers. The State also alleged that Mother did not consistently provide negative drug tests, which impacted her ability to visit Z.E.

The district court heard evidence on the State's termination motion in April 2018. Before presenting evidence, the guardian ad litem asked that the court direct Mother to take a drug test. Mother's attorney had no objection and told the court Mother had

5

recently been in the hospital, had received a steroid shot the day before, and was taking antibiotics and over-the-counter pain medications. The test was positive for amphetamine and methamphetamine. Mother insisted that the test was a false positive and told the court that the last time she used methamphetamine was in July 2017.

During the hearing on termination, the district court heard evidence that Mother successfully completed several tasks on her case plan. She was involved in a variety of mental health services, including participation in a domestic violence group and a parenting program. She also submitted to a psychological evaluation and parenting assessment with Donald Jones, LMLP, who worked with KVC Behavioral Healthcare to perform psychological evaluations. Jones interviewed Mother and had her complete psychological and parenting tests, from which he arrived at diagnoses for Mother: other specified depressive disorder with anxiety; posttraumatic stress disorder (PTSD); borderline personality disorder; and moderate to severe amphetamine use disorder.

Jones testified that his observations of Mother during the parenting test were "complicated" because of a sudden change in her demeanor. The day of the parenting test, Jones completed a brief interview with Mother, and she appeared sad and depressed. They then took a 30-minute break, during which Mother left the building. When she returned to do the parenting test Jones felt her demeanor was significantly different. He described it as close to euphoric. Jones suspected the behavior change was caused by amphetamine use but did not confirm. Mother did perform well during the parenting test, although Jones thought she appeared under pressure.

In addition, the court heard testimony that Mother had obtained other mental health services for which she provided documentation to Hester. Mother completed an intake evaluation in July 2017 with Michael Peters, LSCSW, at Johnson County Mental Health Center. After the intake examination, Peters diagnosed Mother with bipolar II disorder, chronic PTSD, and agoraphobia with panic disorder. He also found she met the

6

criteria for stimulant dependence, amphetamine dependence, alcohol abuse, and borderline personality disorder. Peters expressed his opinion that Mother's substance abuse issues would make it more difficult to treat her mental health issues. Mother did not want her intake or diagnostic information released to KVC, but she did allow Peters to release her progress notes, treatment plan, and medications. In the intake process, Mother admitted to using illegal drugs or misusing prescription medication approximately 120 times in the previous year.

Shana Takacs, a clinician at Johnson County Mental Health Center, testified about her work with Mother. Takacs sent a letter to the court verifying that Mother participated in her dual diagnosis plan and stating that she was active in individual therapy, group therapy, case management services, and medication services. Takacs relied on Mother's self-report that she had been sober since July 2017 and did not ask for drug screens. Takacs did not believe that Mother had taken responsibility for any role she had in Z.E. being placed in foster care.

Crystal Matchette was a social worker at Johnson County Mental Health Center who testified about her role as a case manager for Mother, which involved connecting Mother with community services that could help her achieve stability. For example, Matchette helped Mother search for housing and gave her transportation vouchers to help her get to appointments and work. At the conclusion of treatment, Matchette wrote a letter for Mother stating Mother had engaged in individual therapy, group therapy, and case management sessions through the dual diagnosis program at Johnson County Mental Health. She noted that Mother had been approved for a housing voucher and was working fulltime. Matchette believed Mother was utilizing all of the services available to reunite with her daughter. She also believed that Mother had become better at emotional regulation and using healthy coping skills.

7

Matchette placed a caveat on her opinion about Mother's performance when the court asked Matchette if her opinion that Mother was compliant with everything asked of her would change if it turned out Mother was still using methamphetamine. Matchette replied that she thought Mother was not using drugs and drug use would change her opinion about compliance with the case plan.

In addition to the mental health services for Mother, the district court heard testimony about treatment Z.E. had received while in State care. Shelby Alvarez, LMSW, a mental health clinician at Johnson County Mental Health, met with Z.E. on a biweekly basis for about a year. Alvarez diagnosed Z.E. with PTSD and had Z.E. write a "trauma narrative" called "[Z.E.]'s Story" as part of a trauma-focused cognitive behavioral therapy exercise. For the exercise, Z.E. wrote a story about trauma that she suffered. In her story, Z.E. wrote that Mother "has a boyfriend named [Sean]" and that "[w]hen he got out of jail, she went to him." Z.E. described Sean, stating: "He is very mean. He hurts my mom and he is not a good boyfriend." One chapter in Z.E.'s story was titled "My Mom Fell Out of the Car." It read:

> "I was riding in the car with my mom and Sean. My mom was feeling car sick and she opened the door, and then Sean took a turn and she fell out. And then I got scared because she almost got ran over by a different car. My mom walked back to the car. I think it was a broken leg, but it was scraped really, really bad."

Z.E. also described another incident, in a chapter titled "The Hardest Part to Tell." Z.E. wrote:

> "We hid behind the couch because we were scared that [Sean] had a knife. We were inside and we were looking all around the house and we couldn't find him. Then me and my mom were in the dark outside looking for him. We got very scared, and he was sneaking on us I think and he was around the house and we found him. Then he was hurting my mom. He was punching really fast and he was hitting her a lot. I watched and

8

I thought he was going to hurt me too. After he hurt my mom he ran into the house and we couldn't find him. We heard him talking, we were calling him and he was upstairs. I think he was still mad but he didn't hurt us. [Sean] hurt her more than once, just not this same night."

After working with Z.E., Alvarez noticed a decrease in Z.E.'s behaviors related to the PTSD, and eventually Z.E. progressed to the point that Alvarez decided she did not need additional therapy.

Kelli, who provided foster care for Z.E., testified she saw a stark difference in Z.E. over the course of the case. By way of example, Kelli explained: "When she would get upset, she would run and hide in a corner, and she would say, 'nobody loves me, I have no friends,' and cry and wail, and she just doesn't do any of that anymore. She's a completely different child." Kelli attributed the positive change primarily to counseling and stability.

After hearing the evidence, the district court terminated Mother's parental rights. The court found there was clear and convincing evidence that Mother was unfit by reason of conduct or condition which rendered her unable to properly care for Z.E. and that her conduct or condition was unlikely to change in the foreseeable future. The court also found that termination was in Z.E.'s best interests. The district court's primary concern was stability for Z.E. The court noted that Mother tested positive for methamphetamine, did not have stable housing or transportation, did not provide proof of income, had been fired at least five times during the pendency of the case, and was only partially compliant with mental health treatment recommendations. The court also cited Mother's unwillingness to accept responsibility for the case originally being filed as evidence Mother was unlikely to change in the foreseeable future.

Mother timely appeals the termination order.

9

Mother challenges the district court's termination order in three ways: (1) the evidence was insufficient to support the district court's finding that Mother was unfit and her conduct or condition was unlikely to change in the foreseeable future; (2) the district court abused its discretion when it found termination of Mother's rights was in Z.E.'s best interests; and (3) the district court abused its discretion in its questioning of witnesses.

*Standard of review*

A district court can only terminate a person's parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). "In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009). After making a finding of unfitness, the district court must also find that termination is in the best interests of the child, giving "primary consideration to the physical, mental or emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

*Sufficiency of the evidence*

K.S.A. 2018 Supp. 38-2269 lists a number of nonexclusive factors that courts must consider in assessing whether a parent is unfit to care properly for a child because of conduct or a condition unlikely to change in the foreseeable future. In this case, the district court relied on four of those: K.S.A. 2018 Supp. 38-2269(b)(7), (b)(8), (b)(9), and (c)(3). We look first at the district court's findings, then at evidence to support them.

The factor listed in K.S.A. 2018 Supp. 38-2269(b)(7) requires a court to consider whether there was a "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." The district court stated:

> "Not only has DCF and [its] contractor, KVC, attempted to provide services to [Mother],
> numerous agencies, both public and private in Johnson County, have attempted to assist
> [Mother] in gaining stability and sobriety, but those efforts have failed."

K.S.A. 2018 Supp. 38-2269(b)(8) directs a court to assess whether there was a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." In doing so, the district court stated: "I find that the parent has expended very little effort to change her conduct and condition to meet the minor's needs."

The State filed its petition on April 18, 2016, and Z.E. was taken into custody a day later. The hearing on termination was held on April 18, 2018, two years later. In

11

K.S.A. 2018 Supp. 38-2269(b)(9), the time a child is outside the parent's home is part of the consideration, requiring the court to consider

> "whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

Since Z.E. was never returned to parental custody after she was placed in DCF's care, the time component was met. The district court found "that extended out of home placement has been the result of both the actions and inactions of [Mother]," and made the connection to subsection (c), finding "that pursuant to 2269(c)(3), [Mother] has failed to carry out a plan approved by the Court directed toward the reintegration of the child into the parent's home."

As the district court summarized, the record contains evidence of reasonable efforts from an array of agencies, "both public and private," directed toward helping Mother put in place the basic components necessary before any court would consider return of Z.E. to her care:  sobriety, safety from the domestic relations concerns that proximately led to the filing of the case, and a basic demonstration of stability in housing, transportation, and employment. In each of those areas, the record supports the court's finding that the efforts failed.

The district court found Mother "expended very little effort to change her conduct and condition to meet the minor's needs." The court explained:  "In simple terms, [Mother] has demonstrated no stability in treatment, housing, or employment, continues to use illicit substances and has not behaved appropriately in more than one supervised contact with [Z.E.]." One of the key areas of evidence the court relied on for that finding was the extent to which, after two years, KVC and other helping agencies, especially

Mother's case manager, continued to take the lead in making the necessary calls, contacts, and adjustments to deal with the vicissitudes in Mother's life relating to housing, transportation, and other necessities. The court also remarked on Mother's failure to follow the recommendations for group substance abuse treatment as part of her dual diagnosis treatment plan, as well as the continued positive drug tests that Mother denied were valid. Again, viewing the record in the light most favorable to the State, a rational fact-finder could conclude Mother had not made changes in her life that would be required if she were giving priority to Z.E.'s needs.

Further, the events in the record support the time component consideration of K.S.A. 2018 Supp. 38-2269(b)(9), and all of the evidence the district court cited relating to Mother's failure to progress during the case provides a sufficient basis for the necessary finding that Z.E.'s time out of Mother's home was "as a result of the actions or inactions attributable to the parent." That same body of evidence that the district court reviewed is clearly sufficient to support the court's finding that Mother failed to carry out the court's reasonable plan directed toward reintegration into Mother's home.

In light of the district court's specific recitation of the evidence upon which it relied for its findings, we have no question that a "rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated." *In re K.W.*, 45 Kan.App.2d at 354.

Mother also argues that the State presented no evidence of her being unfit or "unable" to change her circumstances. She cites testimony from the State's witnesses and notes that none expressed an opinion on whether she was unfit or unable to change in the foreseeable future. First, we note an important distinction between being "unable to change her circumstances," as Mother argues, and being unfit because of conduct or a condition that is "*unlikely* to change in the foreseeable future," as stated in K.S.A. 2018 Supp. 38-2269(a). While Mother's *ability* to change was presumed by the existence of a

13

plan to help her do so, the district court was called to make a quite different judgment—whether Mother was *likely* to make the needed changes in a timeframe that would be compatible with Z.E.'s needs. The district court reasoned that Mother's failure to recognize personal responsibility for Z.E.'s situation made it unlikely Mother would feel any need for change. We see ample evidence in the record upon which the district court would have been entitled to rely for the finding that Mother was not likely to change in the foreseeable future.

Next, Mother cites no authority for her argument that there must be witnesses to testify directly on the legal conclusion of unfitness. It was the role of the witnesses to present facts and, in certain permitted instances, opinions. It is, however, the province of the district court to make the legal conclusions based on those facts and opinions. The evidence Mother contends was missing would have been properly subject to objection had it been offered.

*Best interests finding*

Mother's second issue is a challenge to the district court's finding that termination of her parental rights was in Z.E.'s best interests. K.S.A. 2018 Supp. 38-2269(g)(1) directs that:

> "If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order."

"On appeal, the appellate court reviews the best-interests determination for abuse of discretion. A district court abuses its discretion when no reasonable person would agree

14

with its decision or the decision is based on a legal or factual error." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

Mother argues that the State failed to present evidence that termination of her parental rights was in Z.E.'s best interests. Thus, she argues, the district court did not have evidence upon which to base its decision. As with the unfitness issue, Mother fails to cite any authority that would require the State's witnesses to present direct testimony about what they think is in a child's best interests. The witnesses provide the facts and, if qualified, their opinions, and the district court then has broad discretion to decide from all the evidence whether termination is in a child's best interests.

Mother further contends the district court failed to make the findings required for the best interests conclusion. She asserts "[t]he only finding the Court made was that it was in the child's best interests because all children needed permanency." Mother's characterization of the district court's ruling is incomplete. The court explained its decision as follows:

> "I find based on all of the testimony presented, that given the times of violent history of this child's life prior to being taken into custody, [Mother's] complete unwillingness or inability to change or even recognize her contributions to that child's history, and the well-recognized need of children to grow up in a safe, stable environment, that it is in [Z.E.'s] best interests that [Mother's] rights be terminated and the Secretary be given custody of [Z.E.] and the authority to consent to her adoption."

Although Z.E.'s need for permanency would be a proper consideration, the district court clearly based its decision on a view that was much broader than the need for permanency alone. The court's view considered both Mother's behavior and how that behavior affected Z.E. The district court made a reasonable decision that was not based on either factual or legal error. The court, therefore, did not abuse its discretion.

15

*Questioning witnesses*

Finally, Mother also contends the district court abused its discretion by questioning the State's witnesses. She asserts that the State or guardian ad litem should have asked the questions.

We review a claim of error in questioning witnesses for abuse of discretion. See *State v. Boyd*, 222 Kan. 155, 159-60, 563 P.2d 446 (1977). As we have noted above, judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

This issue is raised by Mother for the first time, as she made no objection to the judge's questioning at the time it occurred. Generally, issues not raised before the district court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34) requires an appellant to explain why an issue not raised below should be considered for the first time on appeal. In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014), the Supreme Court held that litigants who fail to comply with this rule risk a ruling that the issue is improperly briefed, and the issue will be deemed waived or abandoned. Thereafter, the Supreme Court held that Rule 6.02(a)(5) would be strictly enforced. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). Mother fails to explain why the issue is presented for the first time on appeal.

Even if the issue had been properly preserved, we would find Mother's argument is meritless. A trial judge may question witnesses:

"We have stated on a number of occasions that the purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant and it is a part of the

16

business of the trial judge to see that this end is attained, even though in accomplishing the full development of the truth it sometimes becomes necessary for him to examine and cross-examine the witnesses." [Citations omitted.] *Boyd*, 222 Kan. at 158.

Nonetheless, there are limits on that authority which are most acutely present during trial to a jury. "[T]he judge must exercise great care to prevent giving the jury the impression that he or she is biased against a party and the judge must not forget the function of a judge and assume that of an advocate." *State v. Plunkett*, 257 Kan. 135, 140, 891 P.2d 370 (1995); see also *State v. Hays*, 256 Kan. 48, 52, 883 P.2d 1093 (1994) (holding that the district court judge did not abuse his discretion by questioning a witness because the judge's questions and comments did not "reveal he assumed the role of an advocate, nor did he show bias or prejudice"); *Boyd*, 222 Kan. at 159 (finding "nothing in the record . . . to sustain defendant's contention that the judge sought to assume the role of an advocate, nor does it support a contention that the judge created prejudice by spoken words, expression of face, or tone of voice").

Here, the district court judge did not abuse her discretion in questioning witnesses. The first time the judge asked a question, she was following up on a question the guardian ad litem had asked Takacs. The judge asked Takacs to clarify her opinion on whether Mother took responsibility for Z.E. entering State care. Takacs replied that she had never witnessed Mother assume responsibility for Z.E. being placed in foster care. The second time, the judge asked Jones about his observation of a change in Mother's behavior and whether he had a suspicion about the cause of the behavior. He replied that Mother's behavior was consistent with amphetamine use. In the third instance, the judge asked Matchette whether her opinion that Mother was doing everything she could to be stable and comply with everything Matchette asked her to do would change if she knew Mother's prehearing drug screen was positive for methamphetamine. Matchette replied it would change her opinion.

Although a trial judge should never become an advocate for any party, the danger of prejudice from judicial questions is most pronounced when a jury is involved as the fact-finder. That, of course, was not the situation here. With the first two witnesses, the judge was clarifying a point already explored by the parties. With the final witness, the judge presented Matchette with facts that she did not take into account when forming her opinion. Matchette based her original opinion on Mother's self-report that she was not using drugs. By allowing Matchette to reformulate her opinion based on new information that was already known by the parties, the judge was able to obtain a more informed opinion from Matchette. In each instance, the judge's questions helped develop the truth—the purpose of judicial questioning. Further, the court's questioning took place after direct and cross-examination, and the judge asked the attorneys on each occasion if they would like to follow up on her questions. This provided the parties an opportunity to deal with the newly elicited information and reduced the risk of bias.

This issue was not properly preserved, but even if it had been the subject of objection at the hearing, we find the district judge did not cross the line between proper inquiry and improper advocacy. There was no abuse of discretion.

Affirmed.