NOT DESIGNATED FOR PUBLICATION

No. 122,654

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

REAGAN KWAMBANDO BOOTO,
*Appellant*.


MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Opinion filed January 21, 2022.
Affirmed.


*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.


*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before SCHROEDER, P.J., WARNER and ISHERWOOD, JJ.


PER CURIAM: Reagan Booto appeals his convictions and sentence for two counts
of aggravated sexual battery based on separate incidents involving students from Fort
Hays State University. He claims several trial errors including: (1) judicial comment
error, (2) error in admission of evidence under K.S.A. 2019 Supp. 60-455(d), (3) error in
allowing testimony related to a witness' credibility, (4) prosecutorial error, (5) cumulative
error, and (6) the use of his criminal history to determine his sentence violated his right to
a jury trial under section 5 of the Kansas Constitution Bill of Rights.

1

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Booto with one count of aggravated sexual battery of H.D. and one count of aggravated sexual battery of A.C.

*H.D. describes her assault by a stranger behind a bar*

In October 2017, H.D. went to a bar in Hays, Kansas with her boyfriend and other friends. Because H.D. was under 21 years old, she could not go inside the bar. Instead, she stayed outside and talked to some acquaintances. H.D. consumed alcohol earlier that evening, between four and six shots, but "not to a point to in any way interact with [her] ability to make decisions." At some point, she had to use the restroom and decided to go back behind the bar.

Alone, H.D. went to a dark area next to the alley and unbuckled her belt. A man with a slight accent, whom she did not recognize approached her, told her she was attractive and "started to get physical" with her. She told the man to "stop" and that her boyfriend was in the vicinity. The man ignored H.D.'s directive and forcefully pushed his lips against hers. She tried to push him away, but he restrained her by holding his arm on her neck. The man used his other hand to touch H.D. on her vagina and her buttocks and inquired "'Don't you want to be with a football player?'" H.D. ordered the man to stop "[a]lmost continuously" throughout the encounter. As she fought to get away, the man took out his phone and attempted to take a photograph. H.D. finally succeeded in pushing the man away and ran back to the front of the bar. Sobbing and distraught, H.D. located her friend, Rohlf, who went inside the bar to find her boyfriend, Tomanek. H.D. told the two men about the assault.

Tomanek and Rohlf searched the area in an effort to find the man. H.D. quickly spotted him and pointed him out. Rohlf recognized the man as Reagan Booto, a classmate

2

of his at Fort Hays State University. Tomanek and Rohlf confronted Booto and asked him to confess but Booto remained silent. A few days later, H.D. reported the assault to law enforcement.

*A.C. describes Booto assaulting her*

A.C. met Booto while bowling with some friends in August 2015. Booto flirted "pretty heavily" with A.C. and said things that made her uncomfortable. She had never dated anyone before. Booto put his hand on her leg, and she removed it. He put his hand back where it was, then ran it up her leg, into her shorts, and touched her vagina. A.C. quickly left with a friend to get away from Booto.

A.C. later encountered Booto two other times while out at bars. On one occasion, Booto asked her to dance, and she agreed because she was with her friends. But Booto "instantly" grabbed her hips and started "grinding" on her. A.C. was uncomfortable so she retreated to the ladies' room, waited for a few minutes, and then returned to the dance floor where Booto resumed dancing "on" her. A.C. returned to the ladies' room and back to the dance floor two more times. When she emerged the third time, Booto was standing right outside the bathroom door, which scared her. On a separate occasion, A.C. thought she saw Booto taking a picture of her and her boyfriend at a bar, which made A.C. uncomfortable.

Following a symphony rehearsal in April 2018, A.C. and her friend, Walters, celebrated. After "a couple too many drinks" the two decided to head to a bar. At closing time, they ran into Booto and his friend outside and the four decided to walk to a house party together. Booto put his arm around A.C. en route. They set out as a group but A.C. and Booto got separated from the others along the way. A.C. expressed a desire to go back and find Walters but Booto insisted there was no need. He put his hands on A.C.'s shoulders and kissed her. She "didn't know how to respond to that," so she "kind of shut

3

down." Booto put his arms around her then slid his hand down the top of her shirt and unbuttoned her pants to touch her vagina on the outside of her underwear. A.C. told him "I [don't] want this," that she wanted to go back to Walters and then attempted to walk away. Scared, mad, and confused, A.C. started yelling for a friend who lived nearby then took off running and fell three or four times. Eventually, she found a hiding spot behind her nearby friend's house. She sent several text messages to her friend letting her know she was outside and pleading for her help because a "Guy won't let me go." A.C.'s friend eventually found her and allowed her to stay the night.

The next morning, A.C. contacted law enforcement. An officer found a shirt that A.C. had been wearing around her waist on the ground where the incident occurred. Corporal David Vilaysing spoke with Booto that day. Booto told the officer that he and A.C. "made out" by the parking lot after the bars closed and that she "surrendered herself to him" along their walk to the party. Booto admitted that A.C. repeatedly insisted that she needed to leave, but he pulled her in closer to him instead. When asked about reaching down her pants, Booto said, "I wouldn't have [gone] there, if she didn't allow me to go there." Booto admitted that A.C. ran away to her friend's house and that he touched her previously at the bowling alley. He denied following A.C. to the bathroom at the bar or taking photographs of her.

*A.P.'s recounts an assault by Booto*

In October 2013, A.P. and Booto were both students at Fort Hays University. They had jobs in the same department and lived in the same dorm building. She had given him her phone number in hopes that he would then leave her alone and stop "bugging [her] for it." Booto ultimately contacted A.P., and she agreed to meet him at the entrance to their dorm building "to be nice." The two took a walk around campus during which Booto pried into her sexual experiences. A.P. told him she was a virgin and was not ready for that to change. Booto told A.P. that he was also a virgin. The two returned to the dorm

4

and Booto followed A.P. up to her room. When she unlocked the door, Booto went inside and sat down on the bed. A.P. sat down next to him.

Booto kissed and touched A.P. But she had never been kissed before so her "brain shut down" and she froze. Booto removed A.P.'s shirt and bra, touched her breasts and then removed her pants and underwear. A.P. did not verbalize her opposition to his touches. Booto briefly inserted his penis inside her vagina, but she pushed him off and ordered him to "stop and leave." Booto repeatedly told A.P. not to call the police. She assured him she would not, but that he still needed to leave. Booto eventually left and A.P. reported the incident to her residence assistant followed by law enforcement.

A.P. went to the hospital and underwent a sexual assault exam. The examining nurse detected a tear in A.P.'s vagina that was consistent with a sexual assault. Meanwhile, Officer Tom Meiers spoke with Booto and Booto expressed his desire to be in a relationship with A.P. because he believed he loved her. Booto recounted how they went to A.P.'s dorm room where he kissed and touched her, removed her clothing, and had sexual intercourse with her.

*Booto's late arrival to trial*

At the time of trial, Booto lived several hours away from Hays. A snowstorm and a series of automobile accidents caused the closure of a portion of I-70 highway which, in turn, delayed Booto's arrival at the courthouse on the first day of trial. The judge advised the jury pool that, because of Booto's tardiness, the start of the proceedings must be delayed.

After the jury pool left the courtroom, Booto's attorney moved for a continuance and a new pool of jurors on the grounds that the judge's statements to the pool that

5

Booto's delay caused them an inconvenience would deprive Booto of a fair trial. The court denied counsel's request.

The case proceeded to trial, and the jury ultimately found Booto guilty of both counts of aggravated sexual battery with which he was charged.

Booto timely appealed and asks us to resolve whether several alleged trial errors compromised his right to a fair trial.

ANALYSIS

WAS BOOTO DENIED A FAIR TRIAL BECAUSE OF JUDICIAL COMMENT ERROR?

Judicial comment error occurs when erroneous judicial comments, which are not jury instructions or legal rulings, are uttered in front of a jury. *State v. Boothby*, 310 Kan. 619, 626, 448 P.3d 416 (2019). Appellate courts have unlimited review over judicial misconduct claims and review them in light of the particular facts and circumstances surrounding the allegation. When a defendant's right to a fair trial is alleged to have been violated, judicial comment error is reviewable on appeal despite the lack of a contemporaneous objection at trial. Judicial comment error is reviewed under the constitutional harmlessness test. Thus, the party benefitting from the error carries the burden to show the lack of prejudice. *Boothby*, 310 Kan. at 624-29 (applying *Chapman/Ward* constitutional harmlessness test to judicial comment error).

A judge should endeavor to conduct the trial in an atmosphere of impartiality and, in accordance therewith, must refrain from remarks or conduct that may adversely impact a litigant. He or she should be the exemplar of dignity and impartiality, should exercise restraint over personal conduct and statements, avoid personal predilections, and control their personal emotions. The judge should not permit any person in the courtroom to

embroil him or her in conflict and should avoid behavior that tends to demean the proceedings or undermines his or her authority. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, those comments should be made in a firm, dignified, and restrained manner, avoiding repartee. Finally, the judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial and should be free of disparagement of persons or issues. *State v. Hayden*, 281 Kan. 112, 125, 130 P.3d 24 (2006).

An appellate court will look for conduct that manifests bias, prejudice, or partiality, or otherwise significantly undermines the fairness or reliability of the proceedings. See *State v. Kahler*, 307 Kan. 374, 384, 410 P.3d 105 (2018), *cert. granted* 139 S. Ct. 1318 (2019); Canon 2, Rule 2.2 Comment [3] (2021 Kan. S. Ct. R. 487) (good-faith errors of fact or law do not violate Kansas Code of Judicial Conduct); and Canon 2, Rule 2.3 Comment [1] (2021 Kan. S. Ct. R. 488) ("judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute"). If a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *State v. Miller*, 308 Kan. 1119, 1154, 427 P.3d 907 (2018).

Booto claims that three specific comments by the trial judge constitute error: (1) the comment to the jury that the trial's late start was Booto's fault; (2) an order for defense counsel to refer to A.P.'s sexual assault examination as a "rape kit"; and (3) questions the judge personally posed to A.C. about her musical interest. Each will be addressed in turn.

*The trial's late start*

On the morning of the first day of trial, prior to voir dire, the trial judge made the following remarks to the jury pool:

"We were going to start this morning promptly. As you can see counsel are present, as is the court, the court reporter, other court staff. Unfortunately, we're missing a rather important person that's supposed to be part of this trial, and that's the defendant. The defendant called this morning, he's on his way here from the eastern part of the state.

"As some of you may be aware, there was a snowstorm last night and this morning. There have been several accidents on I-70. I checked the Topeka Capital Journal this morning, because I subscribe, and at 7:30 they had a report that there was no traffic westbound because of a series of automobile accidents. Apparently, the defendant is trapped in that storm and those accidents.

"He's on his way, but we can't start and we can't have a jury trial without his presence. So we're going to have to delay the commencement of the trial.

"That's a tremendous inconvenience to you, and the court understands that jury service in and of itself is a sacrifice of your time and an inconvenience. So I would apologize, except I'm here on time, but I will apologize for the defendant who is not here and is going to require you to come back here later this morning or right around noon. We'll talk about that, how we are going to conduct this. We have witnesses subpoenaed, and the case is ready except for the presence of the defendant.

. . . .

"Ladies and gentlemen, I need to tell you this: You are not to hold any animosity against the defendant because quite frankly he didn't plan well. Even I knew this was going to be a snowstorm in the eastern part of the state last night, because I check the weather pretty regular and force of habit. Maybe some of you are the same way. So I knew there was that possibility, and I don't think he planned very well.

"But don't hold that against him. Don't let that in any way affect your judgment or how you participate in the case.

"I will remind you of this—this is also a Constitutional right—every defendant in a criminal case is presumed innocent.—And the presumption of innocence remains with

the defendant throughout the trial. It never shifts. The defendant never has a burden. The defendant doesn't have to present any evidence. The burden is always with the State. The State must prove the defendant guilty beyond a reasonable doubt, and the burden always remains with the State.

"So don't shift that burden. Don't say, 'Well, the defendant's running us late already, and I'm going to hold that against him.' Believe you me, I will deal with the defendant, and there will be a consequence for the fact that he was late this morning. That's my job, not yours as a potential juror."

Booto contends the judge's remarks that Booto's lack of planning delayed the start of the trial caused the presentation of inadmissible facts to the jury. He asserts that no amount of planning would have altered the condition of I-70 and, to the extent his decision making fell short of ideal, the judge should not have made disparaging comments to the jury concerning the same. It is Booto's position that the reason for the delay was wholly irrelevant to the charges against him and the judge's comments on the matter resulted in prejudice to him.

The State counters that while it was not incumbent upon the judge to provide the jury with an explanation for the delay, any error that occurred was harmless. As support for this assertion, the State highlights the court's admonishment of the jury to not allow this incident to deter it from its obligation to consider Booto's case in a fair and impartial manner.

The judge's comments were improper and constitute error. As stated above, a trial judge "should endeavor to conduct the trial in an atmosphere of impartiality and, therefore, should refrain from remarks or conduct that may injure a party. . . . The judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial and should refrain from unnecessary disparagement of persons or issues." *Miller*, 308 Kan. at 1154-55. Here, the judge took the rather unconventional,

9

unnecessary, and disparaging step of informing the jury pool that Booto caused them a "tremendous inconvenience" because "he didn't plan well" and there would be "a consequence for the fact that he was late this morning." The remarks were unnecessary. The jury pool simply needed to know that the trial would be delayed or that Booto was delayed because of the snowstorm.

Yet we are persuaded that the error was harmless beyond a reasonable doubt. The comments about Booto's poor planning were isolated and uttered at the very beginning of the proceedings before jury selection even occurred. Additionally, the judge immediately informed the prospective jurors that they were not to "hold that against him. Don't let that in any way affect your judgement or how you participate in the case. . . . Don't say, 'Well, the defendant's running us late already, and I'm going to hold that against him.'" He also instructed them that the "State must prove the defendant guilty beyond a reasonable doubt, and the burden always remains with the State." Finally, at the close of trial, the judge properly instructed the jurors to decide the case only on the evidence admitted. We presume the jury followed the instructions given. See *Boothby*, 310 Kan. at 629. Thus, we find that while the challenged remarks were improper, they were attenuated by the immediate admonishment, voir dire, and the jury instructions.

*Comments regarding the "rape kit"*

During her testimony, A.P. referred to her sexual assault examination as a "rape kit." On cross-examination, defense counsel sought to ask A.P. about her "SANE/SART" exam, but she did not know what that was. She replied, "They just told me it was a rape kit test." The court told defense counsel, "She didn't know it as SANE/SART, just refer to it as the rape kit as she's familiar with it."

Booto contends it is unclear why the judge told defense counsel to refer to the examination as a "rape kit." He asserts there was no legal justification for the judge's

10

order, and that the use of such a term was highly prejudicial to Booto's defense against charges for aggravated sexual battery.

Again, a judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial. *Hayden*, 281 Kan. at 125. If a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *Miller*, 308 Kan. at 1154. Only in those cases in which the judge's comments are overtly biased or pervasive, will a reviewing court find prejudicial error. *Hayden*, 281 Kan. at 124-26; *State v. Mayes*, 33 Kan. App. 2d 9, 14, 98 P.3d 294 (2004).

Error did not occur here. The record is clear why the judge instructed defense counsel to refer to the exam as a "rape kit." A.P. was unfamiliar with the phrase "SANE/SART" exam and responded that she only knew the medical procedure performed upon her as a "rape kit." Thus, the witness offered the term, not the judge. The judge issued a directive to "just refer to it as the rape kit" to avoid further confusion for the witness. The comment did not disparage or result in prejudice to the defense.

*The judge's questions to A.C.*

After both parties questioned A.C., she was excused, and began to exit the witness stand. At that point, the judge inquired which instrument she played and whether she still played regularly:

"THE COURT:  Thank you, Ms. []. What instrument do you play?
"THE WITNESS:  I am percussion. I like mallet instruments. I really like the marimba.
"THE COURT:  Still play?
"THE WITNESS:  No, I don't have a marimba where I'm at now. I wish I did."

11

Booto argues the judge questioned A.C. about her musical interest merely "as an attempt to elicit sympathy" for her. He contends the questions were irrelevant and demonstrated a bias toward A.C.

A trial judge should not question witnesses with "the slightest suggestion of partiality or bias" and should "not assume the role of an advocate." *Kahler*, 307 Kan. at 391. Further, a judge should not give any indication how he or she regards the testimony or credibility of witnesses. *State v. Kemble*, 291 Kan. 109, 114, 238 P.3d 251 (2010). But "[a]cts of common courtesy should be encouraged, not discouraged." *State v. Richard*, 252 Kan. 872, 878, 850 P.2d 844 (1993) (judge handing a tissue to a crying witness was not error).

We believe the judge's questions were unnecessary, but also find there is no indication the judge displayed partiality or bias. Rather, the judge simply engaged in casual conversation with the witness. We caution that such casual conversation should be avoided, however, because at times it may give jurors the mistaken impression that the judge found the witness to be credible. Such a risk is not at issue here. That A.C. is a musician and had been preparing for an upcoming symphony performance the day of the assault were issues addressed during direct and cross-examination by both parties. A.C. and her friend, Walters, likewise both testified about the matter. Thus, it cannot be said the judge assumed the role of an advocate. The questions did not advance or otherwise bolster the State's theory of the case. We decline to find that these brief and innocuous questions amounted to judicial comment error.

DID THE TRIAL COURT ERR BY ADMITTING A.P.'S TESTIMONY THROUGH K.S.A. 2019 SUPP. 60-455(D), AS EVIDENCE OF BOOTO'S PRIOR ACTS OF SEXUAL MISCONDUCT?

The State filed a pretrial motion seeking admission of A.P.'s testimony under K.S.A. 2019 Supp. 60-455(d) as evidence of Booto's prior acts of sexual misconduct.

Counsel for Booto objected on the grounds that the facts were irrelevant to this case. The court conducted an evidentiary hearing and ultimately granted the State's motion. Specifically, it found:

> "There was some initial concern with regard to some of the evidence with regard to her not saying 'Stop'; however, the other evidence was that he asked the cops not to be called, which I think—and based upon the pursuit, plus those comments, I think that the factors that I have to follow in *State v. Bowen*[, 299 Kan. 339, 350, 323 P.3d 853 (2014)] that are set forth in—they are cited in [United] *States v. Benally*[, 500 F.3d 1085, 1090-91 (10th Cir. 2007)]—how clear the prior act has been proved, and how probative the evidence is of the material fact is admitted to prove, and how seriously disputed the material fact is, and whether there's any less prejudicial evidence and then the other factors for potential prejudice; I've considered all of those.

> "I'm going to find that from the evidence that's been presented, in accordance with the law that's set forth in the motion, in my own review of the law, and in particular *State v. Prine*, [297 Kan. 460, Syl. ¶ 3, 303 P.3d 662 (2013)] I'm going to grant the State's motion to use the prior bad acts in this matter."

At trial, Booto renewed his objection "for relevance. This has to do with the incident covered under 60-455. I'm renewing my objection at this time for relevance."

Booto argues that the trial court should not have admitted A.P.'s testimony under K.S.A. 2019 Supp. 60-455(d) because A.P. described an occurrence of consensual sex, not "sexual misconduct." He contends evidence that he and A.P. engaged in consensual sex once was not relevant to prove any material fact during his trial for aggravated sexual battery.

When a defendant is accused of a sex offense, "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible and may be considered for its bearing on any matter to which it is relevant and probative" including

13

propensity. K.S.A. 2020 Supp. 60-455(d). See *State v. Gray*, 311 Kan. 164, 171, 459 P.3d 165 (2020). Sexual misconduct includes sexual contact without consent. K.S.A. 2020 Supp. 60-455(g)(6),(7). Before admitting propensity evidence, however, the district court must still consider whether the potential prejudice outweighs the probative value of the evidence. See *State v. Boysaw*, 309 Kan. 526, 539, 439 P.3d 909 (2019).

Contrary to Booto's assertions, A.P. did not testify that she and Booto engaged in consensual sex. Rather, she described the incident as an "attempted rape" during the pretrial motion hearing. Notably, the State filed charges against Booto in 2014 as a result of the incident with A.P., and Booto pleaded no contest to three misdemeanor batteries for his conduct. At trial, A.P. testified she told Booto she was not ready to lose her virginity and described herself as "frozen" throughout the acts. She also testified she never consented to sexual intercourse with Booto. Tellingly, Booto repeatedly asked A.P. not to call the polic(e prior to leaving her dorm room that day. She ignored his pleas and immediately reported the incident to her residence assistant and then to law enforcement. She also went to the hospital and underwent a sexual assault exam. Booto's contention that A.P. described a voluntary sexual encounter between them lacks merit.

### DID THE TRIAL COURT ERR IN ALLOWING OFFICER HEIMAN TO TESTIFY AS TO WHY HE PRESENTED BOOTO'S CASE FOR CHARGES?

During direct examination, the prosecutor asked Officer Heiman why he felt it necessary to recommend charges in A.C.'s case. The officer testified as follows, over the defense's "relevance" and "hearsay" objections:

> "I believed that based on what I was told by other law enforcement officers in reference to their interviews with Mr. Booto, as well as the report I took from A.C., added to the evidence we were able to collect, that there was validity to her story and that she . . . I believe that the events of that night occurred in a way that were conducive of what A.C.

had told me, that the contact of sexual nature between her and Mr. Booto was nonconsensual, and she had been overcome by force by him holding her to the ground."

Booto argues the trial court erred in allowing Officer Heiman to testify in this fashion because it amounted to him vouching for A.C.'s credibility. He directs us to *State v. Elnicki*, 279 Kan. 47, Syl. ¶ 3, 105 P.3d 1222 (2005) as support for his position. Booto also contends the error cannot be classified as harmless because substantial evidence showed that A.C. consented to sexual activity with Booto.

In Kansas, a witness may not express an opinion on the credibility of another witness. Any determination of the truthfulness or veracity of a witness lies solely with the jury. The trial court has no discretion whether to allow a witness to express such an opinion, the testimony must be disallowed as a matter of law. We exercise de novo review over a trial court's alleged erroneous admission of evidence when that purported error turns on a question of law. *Elnicki*, 279 Kan. 47, Syl. ¶¶ 1-3.

The State argues Booto failed to properly preserve this issue for appeal because he objected on different grounds at trial.

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016). A party may not object at trial to the admission of evidence on one ground and then advance a different objection on appeal. *State v. Robinson*, 306 Kan. 1012, 1028-29, 399 P.3d 194 (2017).

Given those restrictions, we find this issue is not properly before us. At trial Booto objected on the grounds of relevance and hearsay, neither of which provides the foundation for his argument on appeal. His attempt to lay blame at the feet of the trial

judge for having instructed the parties to make only brief objections is unavailing. Such a requirement does not relieve the defense attorney from their obligation to tailor their objection to the specific ground on which they are relying for relief. We decline to undertake an analysis of this issue.

## DID THE STATE COMMIT PROSECUTORIAL ERROR DURING CLOSING ARGUMENT?

The State adopted a theme here that Booto selected victims who were "young," "beautiful," and "vulnerable." The prosecutor first mentioned the theory during opening statements and revisited it during closing arguments.

Booto contends that adopting the theme amounted to prosecutorial error because it encouraged the jury to return an emotion-based verdict.

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error nd prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To determine whether prosecutorial error has occurred, a reviewing court must decide whether the acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether that error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, the court applies the constitutional harmlessness inquiry articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). In other words, prosecutorial error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 109.

16

A prosecutor has wide latitude in crafting arguments and drawing reasonable inferences from the evidence but is prohibited from commenting on facts outside the evidence. The State's argument must accurately reflect the evidence and cannot be uttered with the express purpose of inflaming the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law. *State v. Stimec*, 297 Kan. 126, 128-29, 298 P.3d 354 (2013). For example, a prosecutor's reference to a victim as a family "treasure" was improper when it had no purpose other than to inflame the passions of the jurors in *State v. Nesbitt*, 308 Kan. 45, 56, 417 P.3d 1058 (2018). But in *State v. Duong*, 292 Kan. 824, 833-34, 257 P.3d 309 (2011), a prosecutor merely stated the obvious by arguing that a "little boy" who was taken "advantage of" in a bathroom was "vulnerable" when the prosecutor's comments were closely tied to the admitted evidence and specifically designed to address opportunity and motive.

Here, the prosecutor relied on the evidence presented at trial to explain his theme—young, beautiful, and vulnerable. In his opening statement, the prosecutor stated, "You will hear from [H.D.] that she was young when this incident occurred. . . . You will hear from her that she was told by the defendant that she's pretty." "You will . . . hear from [A.P.] . . . She'll tell you that he . . . made comments about how pretty she was. She will tell you that she was young and not sexually active at the time of this incident, and she had no idea what to do when thrust into a sexually-charged situation." "You will get to hear from [A.C.] as well who will tell you . . . that she was young, she was told that she was beautiful, and she was vulnerable after an evening of celebration."

The prosecutor repeated much of the same when reviewing the evidence during closing arguments. "First we heard from Detective Bunger. . . . He told us that she was under the age of 21. She was young. He told us [H.D.] remembered being told she was a pretty blond by the defendant. She was beautiful. And Detective Bunger told us he believed the position [H.D.] was in was a position which made her vulnerable." "We then

17

heard from [A.P.] herself. She told us that she was a college student at the time, she was young. . . . You will recall how [A.P.] told us she was not sexually active and had never been in a sexual situation before and didn't know what to do. She was vulnerable.

The prosecutor's description of the complaining witnesses as young, beautiful, and vulnerable is not objectionable standing alone, as a simple rhetorical tool. But its repetitive and pervasive use gives us pause as it ventures precariously close to the inflammatory conduct that prosecutors are expressly directed to avoid. The repetition of the phrase was not incidental and highlighted those factors in a way that intimated that the other evidence adduced at trial was less significant. However, because the theme stemmed from the evidence presented at trial, and because there was substantial evidence elicited to sustain Booto's convictions for aggravated sexual battery, we decline to find that the prosecutor's erroneous conduct fell outside the wide latitude afforded the State in presenting its case.

## DID CUMULATIVE ERROR OCCUR IN BOOTO'S CASE?

Cumulative trial errors, when considered together, may require reversal of a defendant's conviction when the totality of the circumstances establish that he or she suffered substantial prejudice as a result of those errors and so their right to a fair trial was not honored. In assessing their cumulative effect, appellate courts examine alleged errors in the context of the entire record, considering also how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019). A single error cannot support reversal under the cumulative error doctrine. *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019).

Booto's case contained but one error. Thus, he cannot prevail on a claim of cumulative error.

DID THE USE OF BOOTO'S CRIMINAL HISTORY TO DETERMINE HIS SENTENCE VIOLATE HIS JURY TRIAL RIGHT UNDER SECTION 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS?

Booto next contends that the use of his prior convictions to increase his sentence without proving the convictions to a jury beyond a reasonable doubt violated his rights under section 5 of the Kansas Constitution Bill of Rights.

Our Supreme Court recently rejected a similar challenge in *State v. Albano*, 313 Kan. 638, Syl. ¶ 4, 487 P.3d 750 (2021). The court held "Section 5 of the Kansas Constitution Bill of Rights does not guarantee defendants the right to have a jury detemine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act." With no indication our Supreme Court is departing from its position, we are duty-bound to follow this precedent. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Booto's sentence does not violate section 5 of the Kansas Constitution Bill of Rights.

Affirmed.